COURT OF APPEALS. Albany, June Term, 1855. Before *Gardiner*, Chief Judge, and *Denio, Johnson, Ruggles, Dean, Hand, Crippen* and *Marvin*, Judges.

## THE PEOPLE, plaintiffs in error, *v.* ANDREW WILLIAMS, defendant in error.

When it is necessary, on the trial of a cause, to inquire into the nature of a particular act, or the intention of the person who did the act, proof of what the person said at the time of doing it is admissible in evidence, as part of the *res gestæ*, for the purpose of showing its true character; but to render such declaration competent, the act with which it is connected should be pertinent to the issue; for when the act is, in its own nature, irrelevant, and when the declaration is, *per se*, incompetent, the union of the two will not render the declaration admissible.

Where, on the trial of A. W. for the alleged murder of his wife by poison, it appeared that he lived apart from his wife, and in the same town, and that his wife left her residence, on Saturday evening before her death, and returned home, at five o'clock the next morning, sick, and continued ill till she died, her symptoms being the same as in cases of poisoning; *Held*, That it was not competent to prove what the deceased said, when she left home on Saturday evening, as to where she was going; and where such evidence was admitted, and it was proved that she said she was going with clothing for her husband, and the prisoner was convicted, it was *held* erroneous, and the judgment was reversed.

Where it was claimed by the prosecution that arsenic had been administered to the deceased, in a bowl in which there had been tea and toast, which had been fed to her from the bowl by the prisoner, during her last illness, and there was evidence tending to identify the bowl as the same one delivered to the physician who had analyzed the contents at the request of the prosecution; *Held*, That it was competent for the prosecution, at the trial, to prove by the physician the condition and contents of the bowl, and the analysis made by him of the contents, though the identification of the bowl by the witnesses was not positive, it being a question for the jury to decide whether the bowl was identified to their satisfaction.

On such a trial, it is proper, on the question of motive, to prove that the wife had, sometime previous to the alleged poisoning, entered a complaint against her husband, the prisoner, as a disorderly person, on the ground that he had abandoned his wife, and that the prisoner was arrested on such complaint, and gave a recognizance, with surety, on which he had been required to pay, and had paid, to the magistrate, weekly, the sum of $2 for the support of his wife.

Where a paper, claimed to be such a recognizance, was produced in court, which purported to be signed by the prisoner and his surety, and to have been taken before a police justice, but had never been filed, and there was

The People *v.* Williams.

no evidence of its execution, except what might be inferred from the testimony of an agent of the governors of the alms-house who produced it, that weekly payments of $2 had been made on it by the prisoner; *Held,* That there was not sufficient proof of its execution to allow it to be read in evidence. By HAND and MITCHELL, JJ.

Where an inquiry into the condition of a person's health is material, any account given by such person relative to his health is evidence of complaints and symptoms; but it is not evidence to charge any other person as the cause of those sufferings. By CLERKE, J.

To authorize any further proof of the statements and declarations made by a person during his last illness, it is necessary to show that they were made under the apprehension of death, and that the deceased was conscious of approaching and inevitable death; and it is not necessary that such consciousness should be uttered in express terms, but it may be inferred from the tenor of his conversation, the nature of his sufferings, and his whole demeanor. By CLERKE, J.

Form of an indictment for murder by poison, and of a certificate of a justice of the Supreme Court allowing a writ of error and staying proceedings.

Symptoms of poisoning by arsenic, as described by witnesses and proved by a physician.

Mode of conducting a *post mortem* examination in such a case, as described by a physician.

THIS case came before the Court of Appeals on writ of error to the Supreme Court, sued out by the district attorney of the city and county of New-York. By the return it appeared that in May, one thousand eight hundred and fifty-four, an indictment for murder, in the following form, was found against the defendant in the New-York General Sessions.

*City and County of New-York, ss:*

The jurors of the people of the State of New-York, in and for the body of the city and county of New-York, upon their oath, present: That Andrew Williams, late of the first ward of the city of New-York, aforesaid, laborer, of his malice aforethought, wickedly contriving and intending one Rose Williams, with poison, willfully, feloniously and of his malice aforethought, to kill and murder, on the twenty-ninth day of April, in the year of our Lord one thousand eight hundred and fifty-four, at the ward,

city and county aforesaid, with force and arms, a certain quantity of arsenic, to wit, two drachms of arsenic, being a deadly poison, feloniously, willfully and of his malice aforethought, did infuse, mix and mingle in and together with a certain quantity of liquor (to the jurors aforesaid unknown), he, the said Andrew Williams, then and there well knowing said arsenic to be a deadly poison. And the said Andrew Wiliams afterwards, to wit, on the day and in the year aforesaid, at the ward, city and county aforesaid, the poison aforesaid, so as aforesaid infused, mixed and mingled with the said liquor (to the jurors aforesaid unknown) aforesaid, feloniously, willfully and of his malice aforethought, did give and administer to her, the said Rose Williams, to take, drink and swallow down into her body; and she, the said Rose Williams, not knowing the poison aforesaid to have been mixed and mingled as aforesaid, afterwards, to wit, on the day and year aforesaid, at the ward, city and county aforesaid, the said poison, so as aforesaid mixed and mingled, by the persuasion and procurement of the said Andrew Williams, did take, drink and swallow down into her body. And thereupon the said Rose Williams, by the poison aforesaid, so mixed and mingled, as aforesaid, by the said Andrew Williams, and so taken, drank and swallowed down into her body, as aforesaid, became then and there sick and distempered in her body; and the said Rose Williams, of the poison aforesaid, and of the sickness and distemper occasioned thereby, from the said twenty-ninth day of April, in the year last aforesaid, until the fourth day of May, in the last year aforesaid, did languish, and languishing did live. On which said fourth day of May she, the said Rose Williams, at the sixth ward of the city and county aforesaid, of the poison aforesaid, and of the sickness and distemper thereby occasioned, as aforesaid, died.

And the jurors aforesaid, upon their oath aforesaid, do say, that the said Andrew Williams, her, the said Rose

Williams, in manner and form, and by the means aforesaid, then and there feloniously, willfully and of his malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the people of the State of New-York and their dignity.

*Second Count.*— And the jurors aforesaid, upon their oath aforesaid, do further present: That the said Andrew Williams, afterwards, to wit, on the third day of May, in the year of our Lord one thousand eight hundred and fifty-four, at the sixth ward of the city and county aforesaid, wickedly, feloniously and of his malice aforethought contriving and intending one Rose Williams to kill and murder, with force and arms, in and upon the said Rose Williams, then and there being, feloniously, willfully and of his malice aforethought, did give and administer unto the said Rose Williams, with intent that she should take and swallow the same into her body, he, the said Andrew Williams, then and there well knowing the said arsenic to be a deadly poison. And the said Rose Williams the said arsenic, so given and administered unto her by the said Andrew Williams as aforesaid, did take and swallow down into her body, by reason and by means of which said taking and swallowing down of the said arsenic into her body, as aforesaid, the said Rose Williams became and was mortally sick and distempered in her body, of which said poisoning and mortal sickness and distemper the said Rose Williams, on the fourth day of the same month of May, in the same year aforesaid, at the ward, city and county aforesaid, died.

And so the jurors aforesaid, upon their oaths aforesaid, do say, that the said Andrew Williams the said Rose Williams, in manner and form aforesaid, feloniously, willfully and of his malice aforethought did kill and murder, against the form of the statute in such case made and provided, and against the peace of the people of the State of New-York and their dignity.

The indictment was sent to the New-York Oyer and Terminer, where the defendant pleaded not guilty; and the issue thus joined came on to be tried in such Court of Oyer and Terminer on the eighteenth May, one thousand eight hundred and fifty-four, before the Hon. James J. Roosevelt, one of the justices of the Supreme Court.

The district attorney, in his opening, stated that Rose Williams, the deceased, came to her death by poison (arsenic) administered to her by the prisoner, her husband, on the night of Saturday, the 29th day of April, 1854, and on the evening of Wednesday, the 3d day of May, 1854.

The following testimony was then taken:

*Mary Campbell*, being sworn, testified: I resided on the first of May last in No. 58 Duane-street; I had been there prior to that three months; I knew the deceased for about a year; we then lived together at No. 28 City Hall-place; we left there and immediately came to Duane-street. Mrs. Williams was with me four months, from February up to her death; I knew her husband; deceased and her husband did not live together; they have not lived together since I became acquainted with her; the last Saturday before her death, she left my house with clothing for her husband (who was a watchman on some ship in the North river), as she said.

This was said in answer to a question by the district attorney, who asked the witness to state where the deceased said she was going on Saturday evening previous to her death. The prisoner's counsel objected to the question, but the court overruled the objection, and the defendant excepted. The witness proceeded:

She did not return until five o'clock the next morning; when she came in she appeared very ill; she said she got sick on board the vessel on which her husband was; she said she had not been drinking; she said that her whole frame seemed as if it were on fire, and her heart felt awful, On the day she returned her husband called to see her, and

The People *v.* Williams.

she was in bed; when he came in she was so glad to see
him that she rose up and put on some of her things; she
then gave me fifty cents and told me to go out and get her
some apples and candies.  When he came in the wife told
him that I had said she had been drinking some liquor, and
he said she had not been drinking anything; I then went
out for the things and brought them in and gave them to the
deceased, and the deceased gave them to the prisoner; I
was absent about five minutes; I put the apples and candy
on the trunk, and deceased handed them to him; she vomited
during the whole Sunday, both day and night; and when
she took any water, which she was continually calling for,
she brought it up; he did not stop very long on Sunday; I
did not notice their conversation particularly; on Monday,
a little before two o'clock, the doctor came; the prisoner
was there on Monday in the afternoon; he told her then that
he had left $10 at the City Hall for her, to pay her weekly
allowance; he said that he would call again, and did so on
the Monday evening at eight o'clock; she was no better
then, and was vomiting all the time; she told him that she
had "felt awful" ever since she had tasted what he had
given to her in a pitcher; he then told her it was the water
she had drank that made her feel so bad; she then asked for
some water, and he would not let her have any; she then
told him to leave, but he said there was time enough; he
then went down stairs and brought up some butter, a loaf,
and some sponge cake; he ate most of it himself; he offered
her some, but she would not eat it; she was frequently
asking for water, but he would not let her have any; she
then asked him to lie down, when he would not go; it was
a far advanced period of the night at this time, and he would
not leave, so that he should prevent her from getting water;
he laid down; I slept in the same room; he remained all
night; she, during the night, wanted water, and he seem-
ingly would be asleep, and when she attempted to get out

of bed to get water he prevented her; at five o'clock on Tuesday he left my room; he did not come on Tuesday, and she was no better, vomiting all the time; he came on Wednesday, about half-past six, P. M.; on Wednesday she felt better, and was up by seven, A. M.; when he came she was in bed, and I was talking to her; he asked her how she felt; she said she felt no better; he sat down by the bedside, and she took hold of his hand and put it on her heart and said the pain was there; she felt as if she was all on fire; she told him to look at her gums; they were all raw; when I last saw that her gums were raw, she asked her husband to look at them; he said they were not so bad as she said they were; he asked her if she had eaten anything; she said yes, some tea witness had made for her, having some toasted bread in it; I made the tea, used the brown sugar taken at the inquest, and tried to get her to take some more of it before he came in, but she could not; placed the bowl on the stove; no fire in it; when he came in it stood in the same place, with toast in it; I drank some of the tea that was in the bowl; he took the bowl and tasted the tea; said it was not sweet enough; she said she did not want any more sugar in it as it made her thirsty; he then asked her if she wanted anything; she said no; I told him a little port wine would strengthen her; he said yes, go and get some; I did so, and returned in about ten minutes, when he was sitting on the bedside with my baby on his lap; I gave her a little of the wine in a tumbler; she did not wish it, but he insisted, and she drank about a tea-spoonful of it; when I came in the toast was broken, and stirred in with the tea, and the spoon was in the middle of the bowl; when I left the toast was whole, and the bowl was nearly full; he took the bowl after I had put the wine away, and asked if there was any sugar; Mrs. Williams replied there was plenty; I got the sugar jar and held it up; he shook the spoon before he put it into the sugar; he took one spoonful and mixed it with the tea and toast; he

The People *v.* Williams.

then said he would feed her with that, as she had often fed him; she then laid on her back on the bed; he gave her one spoonful and told her to sit up; she sat up, and he gave her a few spoonsful more; she said, Andrew, dear, I cannot take any more; he said she must take it, as it would strengthen her a good deal, and if she would he would give her a splendid dress and a new hat; she then put her hand round his neck and kissed him; she had drank nearly all the tea, and then said to me, Mrs. Campbell, you ought to examine your sugar; I asked her what was the matter with it, and she said it was all sand; I then looked at her, and it was like the cracking of salt under her teeth, and he was scraping the bowl, and giving her what was left of it; she took it all; he gave her all; he then set the bowl on my trunk and came back to the bedside, and said, Mrs. Campbell, you did not take any of the wine, and he got up and poured some in the tumbler; I told him I did not care for the wine; I drank it; he then put a spoonful in the tumbler and gave it to his wife; he was then going to leave, and she said on Friday she would be able to go after money; he said she would not; he said he would call on Friday to see how she was, and if she was not able to go he would bring the money himself; as he was leaving he said he would get the money, and leave it with her; he then kissed his wife, and shook hands with her; I then lit him down stairs; when I returned she was vomiting; she told me her whole body was all in a flame, and that her two ears were burning; she said she should not live till five o'clock in the morning; she died about three o'clock, Thursday morning; I was with her when she died, with the exception of a few minutes; from the time I lighted him down stairs, her condition was most awful, vomiting and drinking water; she was conscious to the time of her death; I went to Mrs. Lambert to come in about an hour before her death, for I was frightened at being left there.

*Cross-examined.* The bowl out of which she had been fed was on the trunk when she died; I cannot say how long it remained there; there were half a dozen people in the room from breakfast time until she died; I took hold of the bowl to look at it and set it down again; I handed the police the bowl about ten minutes after she died; I prepared the tea for her about half-past five o'clock on Wednesday afternoon; I got the water to make the tea from Mr. Hart's store; I got it in a wooden pail; I boiled it in a tin vessel which belonged to me; I do not know how many bowls full it would hold; I got the tea from Mr. Cashen's, at the opposite corner; deceased bought the tea on the Saturday previous; we used to use each other's provisions occasionally; when she purchased the tea I had none in my room; I did not purchase any between Saturday and Wednesday; the tea was kept in a glass bottle which I got in Hart's store; I placed it in my trunk; it was not locked then; when the tea was ready I went to the trunk and got a bowl; the bowl was near her bed during the day; I poured out one bowl of the tea for her and two for myself, and sweetened them of the same sugar; she had a slice of toast which I prepared, and she broke it in two and put half in the tea; she took two or three swallows of tea before he came in; she retained the tea on her stomach; I proposed to go out and get some port wine, as it would do her good, and he asked me to go for it; I got the wine in a small black bottle; I got the tumbler from which she drank the wine from outside of my trunk; the tea might have been on the stove an hour before I went for the wine; I had not touched it during that time; the spoon was in the bowl, resting against the side; when I came back, I noticed that the bread was mixed up in the bowl; I made such a statement before the coroner; when I came in, the spoon was standing in the centre of the bowl, upright; the prisoner came four times to see his wife during her illness; once on Sunday, twice on Monday, and once on Wednesday; he came the first time on Monday, before Dr.

The People *v.* Williams.

Bishop came, and the next time after; the first time he remained but a short time; he came the second time at about eight o'clock in the evening; when he came the first time he said he had left the money at the hall.

*David Uhl, M. D.*, testified: I am a physician; I made a *post mortem* examination of the body of Rose Williams; Coroner Wilhelm's deputy, Dr. Richardson, assisted me; I did so on fifth of May, at 58 Duane-street, between eleven and twelve o'clock; I found the woman lying in her bed; her limbs were rigid and contracted; she had purple spots around the mouth and on other parts of her face; there was a slight bruise on the left leg, below the knee, and no other violence on the body; on opening the chest, from the neck down, I found the lungs congested; the heart was healthy, but filled with clotted blood; I then tied both ends of the stomach and laid it on a clean rag on the floor; I then examined the intestines, and laid a portion of them by the stomach; I then took out the liver; I took the contents of the stomach and emptied them into two pint bottles, and sealed them up; the fluid I emptied into them contained a large quantity of white powder which was in large cakes; the mucous membrane was inflamed; I put the stomach and liver in a cloth, and sewed up the body; I then went to the coroner and labeled the bottles; the stomach also contained a large quantity of this white powder. I then took the stomach, bottles and liver to Dr. McCready; he was not in, and I waited until he came in, and I delivered them over to him personally, in the same state in which they were when I took them from the body; the coroner gave me the bowl, which I did not take up to McCready's at that time, because I could not carry it; I locked it up, and took it to him in the evening; I received the bowl at the coroner's office.

*Question.* In what condition was it?

This question was objected to by the prisoner's counsel, and the objection overruled and an exception taken. The

same objection was made to proving the contents of the bowl, which was also overruled and an exception taken.

*Answer.* There was a very white substance on the inside of the bowl, which I carefully scraped, and tied the bowl up in a piece of paper.

*Question.* When did you receive that bowl?

*Answer.* Before I made the *post mortem.*

*Question.* Were you present at the examination of the contents of the stomach?

*Answer.* On the first evening; it was made on the fifth of May; the principal test was Marsh's, which is the best test that can be applied; the test was applied to the white powder in the stomach, and we found arsenic; there was not less than a drachm; on Tuesday evening we made an analysis of the contents of the bowl, and found arsenic.

*Question.* About what quantity?

*Answer.* I cannot say; in my opinion undoubtedly the cause of her death was from arsenic; I did not examine the sugar.

*Cross-examined.* I have made five or six *post mortem* examinations where death was caused by arsenic; I made the *post mortem* in this case about forty-eight hours after death; the coroner handed me the bowl in his office twenty minutes before I examined the body; he did not have it in his hands when I came in; there were three persons in the office; the bowl stood on a table by the desk; I wrapped it up in a piece of paper which was in the office; did not examine it particularly; had no place to lock it up, so hid it under a lot of papers in the office; the room was not locked; I returned in three-quarters of an hour and found the bowl safe and the papers not disturbed; went up to Dr. McCready's three hours afterwards; saw the bowl was safe in the same position as I had placed it; I placed the paper over the bowl in a particular position, and then took it to my office and locked it up; there is one person in my office; he had no access to it; at nine o'clock that evening took it to Dr.

The People *v.* Williams.

McCready's; I examined the rags on which the contents of the stomach were placed, and found them clean; the appearances that would result from antimony and arsenic, when analyzed, would be nearly the same; I am not an expert.

*Benjamin W. McCready* testified: I am a physician; have been a graduate twenty years; have lectured on toxicology; Dr. Uhl requested me to analyze a human stomach, with two bottles with contents labeled and sealed; on fifth May he brought me the bowl and a spoon; from examination of the contents of the body, no doubt arsenic was in the stomach; from its contents four drachms of arsenic were produced; fifteen or twenty grains would produce death; on taking arsenic, the patient feels as though the abdomen was on fire, and vomiting is incessant; the patient complains of its grittiness when swallowed; I would attribute but little importance to blue spots on the body after death; I made a separate analysis of the contents of the bowl and spoon together.

The prisoner's counsel objected to proving the analysis of the contents of the bowl, but the objection was overruled and an exception taken.

The bowl and the spoon were nearly clean and there was no dry powder upon them, but a dirty substance was scraped from them, and, the proper analysis having been made, arsenic was discovered; about two or three grains of matter were taken from the bowl and the spoon, and nearly all of that was arsenic.

*The Coroner* testified: That he held an inquest on deceased on Friday, fifth May, between ten and eleven o'clock; that he received the bowl in question from Lieutenant Bingham, of the sixth ward station-house, about twelve o'clock; that when he received it it was not clean, but there was a whitish stuff adhering to the sides and at the bottom; that he took the bowl with him to the office and gave it to Dr. Uhl, the physician, to make the analysis, and that it did not go out

of his (the coroner's) hands till he delivered it to Dr. Uhl, and that, when given to the doctor, it was in the same state as when he received it.

*James Lanagan* identified the bowl and testified that he received it from Mrs. Campbell, at the house where deceased died, and took it to the station-house and delivered it to Lieut. Bingham; that there was a substance around the side and bottom of the bowl.

*Alonzo Bingham* testified: That he received the bowl from Lanagan; that he noticed some substance in it that looked like gruel; that he set it on a book-case, about eight feet high, in the front office; that he took it from the same place two days afterwards, when he delivered it to the coroner, and that it was then apparently in the same state as when he placed it there.

On *cross-examination,* he said he was not in the office the whole time the bowl was there, and that forty policemen might have been in the room during the forty-eight hours it was there.

A jar of brown sugar was produced on the trial, which was identified as belonging to Mrs. Campbell, and being the one referred to by her, and which it was proved had been taken from her and delivered to the coroner at the inquest, and had been kept by the coroner till produced on the trial.

*George Kellogg, Jr.,* testified: I am the agent for the governors of the alms-house; I know the deceased and the prisoner.

*Question.* Do you know of any complaint having been made by the deceased against her husband?

Counsel for the prisoner objected, as the recognizance was not produced.

Mr. Kellogg produced the recognizance, dated June 7th, 1853.

Counsel for prisoner objected to its reading.

*Examination resumed.* Payments indorsed on the back of the recognizance have been paid by the prisoner to me up

The People *v.* Williams.

to the second of May; I am sure it was on the second of May (Tuesday), at the time of making that payment to me, he stated he thought his wife would not be able to come for the money, and that he would call and take it to her; I asked him "why?" he said she was sick; I told him we could pay it to no other person but her; he then left; the last payment was ten dollars.

*Cross-examined.* We generally require a month's payment in advance; we paid her by weekly installments of two dollars a week; we generally paid on Friday; sometimes she would come for the money and I refused to give it to her.

The district attorney then proposed to put the recognizance in evidence.

The counsel for the prisoner objected to the recognizance being put in evidence, or read to the jury, on the ground that the magistrate had not been produced to prove that it was subscribed and taken before him, and that there was not even proof of the signature purporting to be that of the magistrate.

The court overruled the objection of the counsel for the prisoner, received the recognizance in evidence and permitted it to be read to the jury. To which said decision of the court the counsel for the prisoner excepted. The recognizance was in words and figures following:

*City and County of New-York, ss:*

Be it remembered, that on the seventh day of June, one thousand eight hundred and fifty-three, Andrew Williams, of number twenty-one West-street, in the city of New-York, and William Broock, of number twenty-one West-street, in the said city, personally came before me, Abraham Bogert, one of the police justices for preserving the peace of the city of New-York, and acknowledged themselves to owe to the people of the State of New-York, that is to say, the said Andrew Williams, the sum of three

hundred dollars, and the said William Broock the sum of three hundred dollars, separately, of good and lawful money of the State of New-York, to be levied and made of their several and respective goods and chattels, lands and tenements, to the use of the said people, if default shall be made in the condition hereinafter mentioned.

*Whereas,* The said Andrew Williams has been duly convicted of being a disorderly person, that is to say, a person who has abandoned his wife, Rose Williams.

*Now, therefore,* the condition of the above recognizance is such, that if the above named Andrew Williams shall be of good behavior towards the people of the State of New-York, for the space of one year next ensuing the date hereof, then the above recognizance be void, otherwise to remain in full force and virtue.

Signed,

ANDREW WILLIAMS.

his

WILLIAM × BROOCK.

mark.

Taken and acknowledged before me,
the day and year first above written.

A. BOGERT, Jr., *Police Justice.*

The general character of the prisoner was proved to have been good. After the evidence was closed and the jury had been addressed by the respective counsel, the counsel for the prisoner asked the court to charge the jury that if the bowl was exposed on a table or in a chest, or room, or elsewhere, where many persons had access, between the time it was taken from the room of deceased and the chemical analysis by Prof. McCready, the evidence, as to the analysis of the contents of the bowl, should be rejected.

The court refused so to charge and the counsel for the prisoner excepted.

The court charged, among other things, that the jury might infer that the deceased was with her husband on the

The People *v.* Williams.

Saturday night preceding her death, although the evidence on that point was very slight; to which the counsel for the prisoner excepted.

The court further charged the jury that they might also, if the evidence in their judgment would warrant it, infer that the toasted bread in the bowl was the same which had been mutually used by the deceased and the witness Mrs. Campbell. To this the counsel for the prisoner also excepted.

The jury found the prisoner guilty of murder, and judgment of death was pronounced against him.

A bill of exceptions having been made, the case was carried to the Supreme Court upon a certificate in the following form:

Upon hearing the counsel for the said Andrew Williams, and also Mr. Blunt, the district attorney, on behalf of the people, after due notice to him, and upon examining the above bill of exceptions settled and signed by Justice Roosevelt, who tried the said cause, and at whose desire the matter was heard before me: I, William Mitchell, justice of the Supreme Court of this state, do hereby certify on said bill that, in my opinion, there is so much doubt on the questions of law raised by said exceptions as to render it expedient to take the judgment of the Supreme Court thereon, and that a writ of error should be allowed to the prisoner; and I do accordingly allow such writ of error to issue, and do expressly direct that the same is to operate, as a stay of proceedings on the judgment upon which such writ shall be brought, until the decision of the Supreme Court shall be had upon such exceptions.

In the Supreme Court the judgment of the Oyer and Terminer was reversed, and the following opinions given:

CLERKE, J.—The declaration of the deceased could only have been received as a part of the *res gestæ*, or as a dying declaration.

The People *v.* Williams.

When an inquiry into the condition of a person's health is material, any account given by such person relative to health is evidence of complaints and symptoms; but it is not evidence to charge any other person as to the cause of those sufferings, nor is such an account any evidence of the truth of what has been declared. Anything which Mrs. Williams said to the witness Campbell, relative to the pain she was suffering and the particular nature of her complaint, was admissible; but that portion of her conversation which related to her alleged visit to her husband, and to what occurred during that visit, could only have been received on the ground that she made those statements under the apprehension of death. To warrant this, she must have been conscious of danger, and must have abandoned all hope of recovery, indicating a condition which the law supposes calculated to impress on the mind an obligation equal to that imposed by an oath administered in a court of justice. It is, indeed, the province of the judge, and not of the jury, to determine whether the circumstances under which the declarations were made are sufficient. But there must be some proof that the deceased was conscious of approaching and inevitable death. It is not necessary that this should be uttered in express terms; but it may be inferred from the tenor of his conversation, the nature of his sufferings, and his whole demeanor.

In the present case nothing sufficiently definite was presented to the judge to direct his attention to the subject; the witness was not asked a single question on this point; indeed it is probable, at the time when she made the declarations in question, she had no thought that her life was in danger.

I am of opinion, therefore, that the court erred in admitting those declarations.

A new trial should be granted.

MITCHELL, J.—I concur; and am also of opinion that the recognizance was not sufficiently proved.

The People *v.* Williams.

The cause was then brought into the Court of Appeals by a writ of error issued on behalf of the prosecution.

*A. Oakey Hall* (District Attorney), for the people.

I. The Court of Oyer and Terminer were correct in admitting the declarations of the deceased, excepted to, and the court correctly charged the jury upon them. First. There were declarations made by her when leaving to visit her husband. Second. There were those made in presence of her husband. Third. There were some made *in extremis.* Fourth. There were others regarding feelings of and symptoms of bodily condition. The declarations embraced by third and fourth subdivisions are so clearly admissible, it will not become necessary to discuss them. There were two classes of facts, embraced by the prosecution, unto which these declarations related: First. Showing that deceased died from poison; Second. Showing that prisoner poisoned her. It is respectfully insisted that the general term mistook the extent and effect of the testimony thus excepted to. The evidence concerning the "going" of the deceased was pertinent, to show her then healthy state, her frame of mind, her disposition toward her husband, and particularly herein rebutting the idea of suicide by the deceased. The delaration, answering question excepted to, viz.: "State where deceased said she was going on the Saturday evening previous to her death," accompanied an act. It was (1 *Greenl. Ev.*, §§ 109, 123) "a verbal act, indicating present purpose and intention." It was a declaration, part of, and accompanied by, and explanatory of an act. (1 *Phil. on Ev.*, 204.) There was a declaration, "She said she got sick on board the vessel, on which her husband was; she said she had not been drinking," &c. There was no exception taken to this upon the trial, but the court, at general term, criticise it in the opinion. No exception was taken, for the very obvious reason that, when the prisoner came to see

the deceased, after her return, from "somewhere," the conversation and remark between the two showed that she had been with him, in accordance with her intention expressed at starting. And the declaration as to her being taken sick from drinking, &c., &c., was also remarked upon by prisoner. Now, it is insisted that, even if the "verbal act," or her declaration of whereabouts, were inadmissible, the fact which they went to prove (presence with husband on the vessel and sickness there) was evidenced by the husband's admissions and remarks on the subject. The defect, if defect, was cured. Then the judge charged "that the jury might *infer* that the deceased was with her husband on the Saturday night preceding her death, *although the evidence on that point is very slight.*" The expressions of symptoms were competent testimony (1 *Greenl. Ev.,* § 102; 1 *Phil. Ev.,* 190; *Aveson* v. *Kinniard,* 6 *East,* 189), relevant to show the first fact averred in the indictment, "death by poisoning." It was said below that the symptoms could not charge the prisoner. The suggestion is made that the general term mistook the effect and extent of this testimony respecting symptoms, because the evidence of the poisoning whereof she died was upon an occurrence unaffected by the declarations as to departure and symptoms; indeed, upon an occurrence subsequent to the time of their being made. Saturday, in the evening, she leaves to visit her husband. Sunday, in the morning, she returns; prisoner comes to see her. Monday, in the afternoon, prisoner calls again and leaves; returns in the evening and stays all night until Tuesday, to five in the morning, and goes away. Wednesday, in the afternoon, he came again, and then sedulously fed her from the bowl whose contents showed presence of arsenic, &c. Thursday, near daybreak, she died. Had the prisoner been, how could he be, affected by the alleged declarations? The evidence came in as part of the *res gestæ* in a chronological chain of testimony from the time she

ceased to be in good health until she died. But the poisoning itself is·upon evidence entirely unexceptionable.

II. The Court of Oyer and Terminer correctly admitted the testimony concerning the bowl and its contents. 1. It was competent for the jury. The jurors could give to it what regard they chose. The bowl was traced for identity in the same manner in which any fact of the same nature is traced by lines of evidence. 2. The bowl was traced from the prisoner most directly. The prisoner placed it upon a trunk, from whence Mrs. Campbell, the witness, took it; she gave it to officer Lanagan; officer Lanagan to Lieut. Bingham; Lieut. Bingham to the coroner; coroner to Dr. Uhl, and to Dr. McCready, and the two make an analysis. There was arsenic found in the bowl. The jury found that this bowl was the same bowl which the prisoner used when feeding his wife. Their finding is conclusive.

III. The court properly allowed the introduction of the recognizance. It was pertinent to show a motive for the crime. 1. It was a recognizance, and not a bond. (*Laws of* 1833, 11, § 7 ; 2 *R. S.*, 920, § 31, 4*th ed.* ; *id.*, 53, 54 ; *The People* v. *Kane,* 4 *Denio,* 540, 543.) 2. It was a record, and proved itself. (*Id.*) 3. It was authorized by statute, and taken and acknowledged before an officer thereunto authorized. (*Id.*) 4. It came from the custody of those entitled to sue upon it by statute. 5. But the court will see, from the manner of the production of the recognizance, that it came not only as if proving itself, but in connection with the testimony of George Kellogg, Jr., Alms-house superintendent, exactly as if it were a private admission of the prisoner, and upon which he had acted. 6. The recitals proved nothing more than the evidence of Mr. Kellogg, showed to be the fact. 7. This being the case, how has the prisoner been, or rather how could he have been, prejudiced?

*Henry L. Clinton,* for the prisoner.

I. The court erred in admitting in evidence the declarations of the deceased, as stated by Mary Campbell. This answer was elicited by the district attorney asking the witness to state "where the deceased said she was going on the Saturday evening previous to her death," and taken under defendant's objection and exception. The court also erred in charging "that the jury might infer that the deceased was with her husband on the Saturday night preceding her death." This inference rested solely on these declarations of the deceased, made in the absence of the prisoner. The testimony was mere hearsay, and was clearly inadmissible. In the case of *Kirby* v. *The State* (9 *Yerger*, 383), it was held that evidence that the deceased, while on his way to the place where he was found murdered, and the day before he was supposed to be killed, had stated that he was going to that place, and that the defendant was going with him, was incompetent. In *Zeller* v. *The State* (2 *Halst.*, 220), it was held that conversation of the deceased with a third person, or acts of the deceased which never came to the knowlege of the prisoner, cannot be received in evidence. The principle of these cases is too clear and well established to require a citation of further authorities. There was no pretence on the trial that these statements of the deceased were dying declarations, and if they had been offered as such they would have been clearly inadmissible; because they were not made *in articulo mortis*, or under the consciousness of impending dissolution. On the contrary, the deceased, during the time these declarations were made, and afterwards until a few hours before her death, indulged the hope of recovery. When her husband left her on Wednesday evening, she stated that "on Friday she would be able to go after her money." (*Rosc. Cr. Ev.*, 27, 33; 1 *Phil. Ev.*, 285, 9*th ed.*; 2 *Russ. on Cr.*, 752–4, 6*th Am. ed.*) The declarations formed no part of the *res gestæ*. The most important declaration of the deceased was: "She did not return until five o'clock the next morning; when she came *she said she*

*got sick on board the vessel on which her husband was.*" This, if true, was a narrative of a past occurrence. In 1 *Greenleaf's Evidence* (§ 110), the author, in speaking of what constitutes *res gestæ*, says: "It is to be observed that where declarations offered in evidence are merely *narrative of a past occurrence*, they cannot be received as proof of the existence of such an occurrence. They must be *concomitant* with the principal act, and so connected with it as to be regarded as the mere result and consequence of the co-existing motives, in order to form a proper criterion for directing the judgment which is to be formed upon the whole conduct."

The declarations of deceased as to her symptoms were not evidence to charge the deceased, nor were her declarations any evidence of the truth of what she declared. (*See opinion of Justice Clerke.*) The point as to the admissibility and effect of these declarations, and particularly as to the declaration of deceased that "she got sick on board the vessel on which her husband was," is distinctly raised: First. By the decision of the court allowing the declarations to be given in evidence. Exception was taken to the decision of the court below, in allowing the particular answer of the witness embracing these declarations to be regarded as evidence; Second. The point is distinctly raised in the exception to the charge of the court, "that the jury might infer that the deceased was with her husband on the Saturday night preceding her death," there being no evidence of the fact other than these declarations; Third. Now the statute provides that, on "every conviction for a capital offence," &c., the court may consider any question of law arising in the cause, whether exception was taken or not. The prisoner suffered material prejudice in the introduction of these declarations; they formed the material links in the chain of evidence which resulted in his conviction.

II. The testimony of Dr. Uhl as to the condition and contents of the bowl, taken under exceptions, and the analysis of the contents of the bowl by Prof. McCready,

taken under exceptions, were improperly admitted because they were not sufficiently identified; and the court erred in refusing to charge as requested on that subject. Even in the case of larceny or counterfeiting, the identity of the stolen property or counterfeiting must be proved. (1 *Russ. on Cr.*, 125; *Rosc. Cr. Ev.*, 632.) A double reason exists for proving the identity of the poison in this case.

III. The court erred in receiving in evidence the recognizance without due proof of its execution. This instrument was introduced, not as a record, but as a private writing. There was no legal proof of the acknowledgment of this paper, or of its having been filed as a recognizance or bond. The certificate of proof or acknowledgment being in these words, "Taken and acknowledged before me the day and year first above written," and purporting to be signed by "A. Bogart, Jr., Police Justice," does not entitle the instrument to be read in evidence without further proof thereof, because it does not certify that the individual was known to the officer, or identified by satisfactory proof, and because the officer was not authorized to take acknowledgments of conveyances of real estate, and his signature was not proven. (1 *R. S.*, 758, §§ 9, 15, 16; 2 *id.*, 42, 43, *3d ed.*) Police justices are not named among the officers referred to (1 *R. S.*, 758, § 16) as having authority to take proof or acknowledgment of conveyances of real estate. The courts of this state are strict and uniform in requiring a substantial compliance with these statutory provisions, and in no case have they dispensed with the certificate of an officer having jurisdiction or authority to take the acknowledgment, and in requiring him to state that he knew or had satisfactory evidence that the person making such acknowledgment was the individual described in and who executed such conveyance. (*Jackson* v. *Humphrey*, 1 *John.*, 498; *Jackson* v. *Gumaer*, 2 *Cow.*, 552; *Jackson* v. *Vickory*, 1 *Wend.*, 412; *Duval* v. *Covenhoven*, 4 *id.*, 563; *Broadstreet* v. *Clark*, 12 *id.*, 673; *Dibble* v. *Rogers*, 13 *id.*, 541; *Thurman* v. *Cameron*, 24 *id.*, 87; *Merriam* v. *Horsen*,

The People *v.* Williams.

·2 *Barb. Ch. R.*, 232; *Crowder* v. *Hopkins*, 10 *Paige Ch. R.*, 183;· *Jackson* v. *Shepherd*, 2 *John.*, 79.) The court also erred in receiving the recognizance in evidence, because it tended to show the prisoner guilty of the offence of being "a disorderly person," and his character could not be attacked in that way. (2 *Russ. on Cr.*, 784; *Russ. Cr. Ev.*, 97; *Arch.*, *Cr. Pr.*, 111.)

DENIO, J.—The evidence to show that the deceased came to her death from the effects of arsenic taken into her stomach was quite satisfactory; and there was strong reason to believe that she swallowed a portion of this poison during her absence from the house in Duane-street, between Saturday evening and Sunday morning. If, during that absence, she was in the company of the prisoner, the latter had an opportunity to administer it to her in food or drink. His subsequent conduct was such as to attach suspicion to him, and to lead to the belief, more or less strong, that if she was poisoned during that absence he was guilty of the act, provided it was made to appear that he had an opportunity of committing it. Hence it was an important fact for the prosecution to establish that these persons met together while the deceased was abroad on Saturday night. It was competent to show this by the evidence of persons who saw them in each other's company; or it might have been proved by the prisoner's confessions. There was some evidence of the latter character; for the prisoner was proved to have asserted that the deceased did not indulge in drinking while she was from home, at the time referred to, a fact which he could scarcely have known except by having been with her. Although the inference from this declaration was pretty strong, and might have enabled the jury to find the fact, it was not of such a conclusive character as to preclude other testimony upon the point, and the prosecution sought to furnish such other evidence by proving the declaration of the deceased, of her intention to go to her husband, when

she set out from home on Saturday evening. The question to be determined is whether that declaration was competent to be given in evidence. The evidence of the witness Mary Campbell, of what the deceased said, after her return, as to her having been with her husband, was not objected to. It was, however, clearly incompetent. It was not admissible as a dying declaration; for, although the deceased returned very ill, there is no evidence, nor any reason for believing, that she then apprehended a fatal result. The circumstance that it was received without objection, and that it tended even more strongly to show the existence of the material fact sought to be proved than the declaration which was objected against, does not relieve us from the duty of examining the validity of that objection. The jury may have disregarded the incompetent declarations made by the deceased after her return and have relied upon the proof of her declared design on setting out, which the court had held to be competent; or the ruling of the court, admitting her declaration last mentioned to be received, may have led them to the belief that all her declarations which were proved were competent. We must therefore determine whether the decision of the court below, admitting proof of the statement that she was going to see her husband, when she left the house on Saturday night, was correct or not. It was attempted, on the argument, to be sustained as a declaration characterizing an act, and constituting, in legal understanding, part of the act itself. This is a recognized exception to the rule excluding hearsay as evidence; for when it is necessary, in the course of a cause, to inquire into the nature of a particular act, or the intention of the person who did the act, proof of what the person said at the time of doing it is admissible in evidence for the purpose of showing its true character. (1 *Phil. Ev.*, 231, *Gould's ed.*) But to render the declaration competent, the act with which it is connected should be pertinent to the issue; for where the act is in its own nature irrelevant, and when the declara-

tion is *per se* incompetent, the union of the two will not render the declaration admissible. (*Wright* v. *Doe*, 7 *Adolph. & Ellis*, 289.) The material fact here was, that the prisoner and the deceased were together on Saturday night. Even this was not a principal fact, but only a circumstance to show that the prisoner had an opportunity to commit the offence. That the deceased left the house in Duane-street at a particular time was of no materiality, unless it was also shown that during her absence she met the defendant. The act itself was indifferent to the issue, whatever the intention was with which it was done. If the deceased met the prisoner, and thus afforded an opportunity of committing the offence, it is immaterial whether she intended or expected thus to meet him or not; and so, of course, if she failed to meet him he could not properly be prejudiced by the circumstance that she went out with a design to go to him. The evidence was not offered to qualify an act connected with the issue, but to induce the jury to infer another act not otherwise shown to exist: that of his being in company with the deceased. Suppose a declaration had been made by the deceased, on the previous day, of an intention to go to her husband on that particular evening: such declaration being unaccompanied by any act would rest wholly in assertion, and would be clearly without the rule referred to; yet the proof would be essentially of the same character, and subject to no greater objections than the evidence we are considering. I am of opinion, therefore, that the case was not within the rule admitting a declaration accompanying an act, on the ground of its being a part of the *res gestæ;* and I know of no other ground upon which the case can be taken out of the general rule which excludes, under the name of hearsay, declarations not made under the responsibility of an oath.

Enough has been said to show that the judgment of the Supreme Court ought to be affirmed.

Upon a second trial the question will again arise as to the admissibility of the evidence showing that arsenic was found in the bowl which was examined by the chemist. We have looked carefully into the evidence of identity, and are of opinion that it was sufficient to authorize the court to submit the question to the jury.

The judgment of the Supreme Court must be affirmed.

HAND, J.—The proof of what the deceased said when she was leaving the house of Mrs. Campbell was not admissible. It was no part of the *res gestæ*, for it was no part of the principal transaction, nor cotemporaneous, or even incidental to it. It was spoken at a time previous to any part of the transaction constituting the supposed offence, and in the absence of the prisoner, and when the deceased had no apprehension of danger, and much less *in extremis*.

I see no objection to the testimony in relation to the bowl or its contents. Whether the evidence was sufficient to identify the former, or show what constituted the latter, were questions for the jury, and the proof given on these points was competent for their consideration. No one portion of it, or that given by one witness, might have been sufficient; but all of it together might be, and the prosecution was not obliged to give conclusive proof at every step.

It was also competent for the prosecution to prove that the prisoner had made payments upon the paper produced in court. That was a mere circumstance, and the production of the paper and such proof did not contravene any rule of evidence in relation to the proof of written instruments.

But the recognizance itself was given in evidence without any proof of its execution, except what appeared upon the face of the instrument, and the testimony of an agent of the governors of the alms-house that the prisoner had made payments upon it. I am inclined to the opinion this was not sufficient. A recognizance is said to be a matter of record.

The People *v.* Williams.

(1 *Chit. Cr. L.*, 90; *The People* v. *Kane,* 4 *Denio,* 530.) But this was taken before a police justice in the city of New-York, under the statute in relation to disorderly persons, and is but an acknowledgment, upon which, perhaps, a record might be made up. It does not appear to have been filed with any officer, and there was no proof of its execution nor of the identity of the persons recognized, except by the payments. Using one's own affidavit in a cause may sometimes be sufficient evidence of identity as against the party making it; but, as a general rule, even an affidavit cannot be given in evidence, at least before it is filed with the proper officer, without some proof. (1 *Chit. Cr. L.*, 576; 1 *Phil. Ev.*, 379; *Bellinger* v. *The People,* 8 *Wend.*, 598; *Rex* v. *Smith,* 1 *Stra.*, 126; 2 *Cow. & Hill,* 1100.) This recognizance must have been introduced for the purpose of showing an inducement to commit the crime, or that difficulties had existed between the husband and wife. It purported to have been signed by the prisoner and another, and to have been taken before an officer; but it would be dangerous, especially in a capital case, to admit such a document without any proof whatever.

However, it is not necessary to pursue this point further, as the admission of evidence of what the deceased said before the commission of the supposed offence clearly entitled the prisoner to a new trial, and the Supreme Court was therefore right in reversing the judgment on that point.

The judgment should be affirmed.

The other judges concurring,

The judgment of the Supreme Court, reversing that of the Oyer and Terminer and ordering a new trial, was affirmed.