The State v. Punshon.

THE STATE v. PUNSHON, *Appellant.*

Division Two, November 5, 1894.

1. **Criminal Practice**: MURDER: EVIDENCE. On the trial of one for the murder of his wife, it is competent for him to show that their domestic relations were of an affectionate character.

2. ———: ———: ———: HEARSAY. Statements made, however, by the wife before the killing tending to show the affectionate character of such relation are properly excluded because hearsay. (*State v. Leabo,* 84 Mo. 168, *overruled.*)

3. ———: ———: ———: ———. Threats made by the wife to kill herself are also inadmissible.

4. ———: ———: ———. Evidence that the deceased who died from a pistol shot was an expert with the pistol is irrelevant.

5. ———: ———: MANSLAUGHTER: INSTRUCTIONS: REVERSIBLE ERROR. Where the evidence on a trial for murder shows conclusively that the accused is either guilty of murder in the first degree or innocent of any crime, an instruction on manslaughter is reversible error, if he be convicted of manslaughter.

6. ———: ———: HEARSAY EVIDENCE. A note found on the person of the deceased after her death, *held,* not the proper subject of comment to the jury.

7. ———: ———. Murder trials should be conducted by the trial court without exhibition of feeling and with the strictest impartiality.

*Appeal from Buchanan Criminal Court.*—HON. SILAS WOODSON, Judge.

REVERSED AND REMANDED.

*George P. Rowe, Vories & Vories* and *Huston & Parrish* for appellant.

(1) The court erred in refusing to permit defendant to prove the peaceable and happy relations of defendant and his wife; what she said as to the cause of her absence from him; and her threats to kill herself; and the reason therefor, and that she was an expert in the use of firearms; and was in the habit of carrying a revolver. *First.* They were proper subjects to be considered by the jury as explanatory of the means and manner of her death. *Second.* The fact that the defendant and his wife lived happily together, was proper evidence to disprove the existence of the motive on his part to kill her. *State v. Leopold*, 84 Mo. 168; *State v. Watkins*, 9 Conn. 47; *State v. Green*, 35 Conn. 205. *Third.* The evidence being wholly circumstantial, the jury were entitled to all the aid that might have been offered them by the slightest fact or circumstances tending to enlighten them on the issues tried. *State v. Moxley*, 102 Mo. 274; Wharton's Crim. Ev. [8 Ed.], secs. 21–27; 5 Law Journal, 237; *Cooper v. State*, 19 Tex. 449; *Reg. v. Johnson*, 2 Car. & K., 354; 1 Greenleaf on Evidence [14 Ed.], sec. 102. *Goins v. State*, 21 N. E. Rep. 476. (2) The court was guilty of gross misconduct, and committed unpardonable error, in his speeches in the presence and hearing of the jury, when passing on the competency of evidence offered by defendant. These speeches were nothing less than an urgent appeal to the jury to disregard the evidence before them, and were calculated to prejudice the jury against the defendant. *People v. Hull*, 49 N. W. Rep. 288; *State v. Hill*, 91 Mo. 423; *State v. Sivils*, 105 Mo. 530; *Newbury v. State*, 8 S. Rep. 445; *State v. Raymond*, 21 Atl. Rep. 328; *Griffin*

*v. State*, 8 S. Rep. 670; *Cook v. State*, 11 S. W. Rep. 444; *People v. Moyer*, 43 N. W. Rep. 928; *Sharp v. State*, 10 S. W. Rep. 228; *People v. Willard*, 28 Pac. Rep. 585; *People v. Wood*, 27 N. E. Rep. 365; *Massie v. Commonwealth*, 24 S. W. Rep. (Ky.) 611; *Kelley v. State*, 24 S. W. Rep. (Texas) 295. (3) The court erred in not admitting the evidence of Batcheller as an expert in firearms, as it was desired by the defense in this case to show, not only that Punshon could not have fired the shot from his position, but from the powder marks, etc., it must have been done by the woman herself. *Davis v. State*, 38 Mo. 15; Wharton on Criminal Evidence, sec. 409, and notes; *State v. Avery*, 110 Mo. 415; *Sheldon v. Booth*, 50 Iowa, 209; *Cole v. Clark*, 3 Wis. 323; *State v. Cross*, 68 Iowa, 180; *Myers v. State*, 14 Texas, 35; *Sullivan v. Com.* 98 Pa. St. 284; *Boyd v. State*, 14 Lea (Tenn.) 161; *Brownwell v. People*, 38 Mich. 735; *Eidt v. Cutter*, 127 Mass. 523; *Holt v. Utah*, 120 U. S. 430. (4) The court erred in instructing the jury on manslaughter in the first degree, and in refusing defendant's instruction number 1, and modifying it and giving it as modified. There is no evidence whatsoever—not an item—upon which to base the instructions. This court said as early as the case of the *State v. Starr*, 38 Mo. 272, that it was wrong to mislead the jury by instructing as to an offense not warranted by the evidence, and this principle has been reiterated by the court in almost every volume of the supreme reports since then. *State v. Allen*, 116 Mo. 548; *State v. Herrell*, 97 Mo. 107; *State v. Wilson*, 88 Mo. 19; *State v. Turlington*, 102 Mo. 642.

*R. F. Walker*, Attorney General, and *Morton Jourdan*, Assistant Attorney General, for the state.

(1) The indictment is in the usual form for murder in the first degree and is sufficient. (2) The defendant

having been convicted of manslaughter in the first degree can not complain of the instruction on murder in the second degree.    (3) The remarks of the court complained of by appellant could not have prejudiced defendant and hence should not reverse the judgment. (4) The court did not commit error in refusing to permit defendant's counsel to comment on the note found on the person of the deceased and upon the fact that the state had failed to introduce it.    (5) The verdict is supported by the weight of the evidence and should not be disturbed.

BURGESS, J.—At the March term, 1894, of the criminal court of Buchanan county, the defendant was indicted for murder of the first degree for having killed and murdered Jennie Punshon, his wife, on the fifth day of January, 1894.    At the same term, defendant was tried, convicted of manslaughter in the first degree, and his punishment fixed at imprisonment in the penitentiary for a term of twenty years.    The case is in this court on his appeal.

The record discloses the following state of facts: At the time of the homicide defendant and deceased were husband and wife, but for sometime prior thereto they had not lived together, the defendant staying with his mother and the deceased with her mother; that on the morning of January 5, 1894, the defendant met the deceased on the street in the city of St. Joseph and they went to the residence of his mother, Mrs. Punshon; that when they arrived there he took her upstairs and locked her up in a room; that he took the key and went down stairs, where he met one Miss Cooper, to whom he said: "Jennie is upstairs; come let's go up there."    They then went upstairs, when defendant unlocked the door and they entered the room, in which the deceased was sitting on a chair with

her hat on, when she remarked to Miss Cooper, "I did not want to come here." Defendant accused the deceased of "telling their affairs to other people," and, being denied by her, he took hold of Miss Cooper's arm and called her a liar. Miss Cooper then slapped him in the face, and he, in return, slapped her in the face. Shortly after this occurrence, deceased left and went to the house of her mother, some ten or twelve blocks away. Between 5 and 6 o'clock of the same evening defendant borrowed a pistol from Lon Myers of 32 caliber and containing five chambers.

At about half past 6 Mrs. Windish, the mother of the deceased, and Fred., Gardy and John Windish were in the kitchen at the Windish home, when the defendant rapped at the door and was admitted by his wife; a single-barrel shotgun was standing near the door; when he came in, Mrs. Windish, the mother, stepped over and picked up the shotgun; when defendant said: "Oh, I guess not," drew a revolver from his pocket and said: "I've got six loads here, enough for all; I will just kill us all;" said he wanted to talk to his wife, and when her mother remonstrated and started toward the front door, defendant said: "Do not go, I've got the front door guarded," etc.   *   *   *   "I will kill her (Jennie)," and thereupon drew his revolver upon her. In the meantime Freddie, the brother, was begging the defendant not to shoot. Defendant went into the third room, saying, "Here, Freddie, I want you to witness this." Pointing his revolver at his wife, he said: "Are you ready to die?" The brother again implored him not to shoot, but to leave; that Jennie was sick, and to leave her that night anyway; when the defendant said to his wife: "You lie down here where it is warm." "Freddie," he said, "if you will open the door I will go;" and when the door was open he grabbed up his

wife and carried her from the house into the street, saying he had a carriage on the corner, and for none of them to follow him. In the kitchen defendant said: "I made that arrangement to day; I was to kill her and then kill myself."

Defendant and his wife were next seen at Beeninger & Co.'s saloon, nine blocks from the Windish residence, where the defendant went in and requested to use the telephone in order to call a carriage. The deceased was bareheaded; seemed to be in distress; was crying. They waited there until a carriage arrived. To one of the bartenders of the saloon, defendant said that he had taken his wife from his mother-in-law's house; that the people at the house had fired two shots at them when they were leaving; that they had staid down at Twenty-second and Messanie for about three-quarters of an hour; that the whole neighborhood was out scouring for them. He showed the bartender a white apron he had under his coat; said he had made his wife take it off so that the people could not see them in the dark. When the hack arrived, it was in charge of T. H. Donnahue; to him the defendant said: "I telephoned for Jim Donnahue; I didn't telephone for you; this is particular; I do not want you to say anything about it; I was over at my mother-in-law's and raised hell over there."

The defendant and his wife got into the carriage; the defendant instructed the driver to drive to Eleventh, below Doniphan avenue. After the carriage had proceeded about eight blocks to Fifteenth street, below Renick, the driver heard a pistol shot, stopped his team, got down and opened the carriage door, found the deceased sitting on the right on the back seat, the defendant on the left, the deceased's head leaning against the cushion and her face bloody, a bloody pistol lying on her bosom, the defendant's

hands bloody. He sat by her side quite composed. Heard him say, "Jennie, Jennie, speak to me." After the door was opened, the defendant said to the driver, Donnahue, that his wife had shot herself, and to drive to a doctor's or get a doctor. The driver took his team and started south again. When they arrived near Jester's brewery the driver hailed Policeman McCoy, and related to him the shooting. When McCoy opened the carriage door defendant then had his arm around the deceased and had her limbs pulled up across his knee, and the pistol lying in her lap with the handle or grip toward the defendant. Defendant's right hand was bloody. McCoy got into the carriage and drove with the parties to the defendant's mother's. When they stopped, McCoy asked the defendant to assist him in carrying his wife into the house, which he did not do, and the policeman carried her by himself. After laying her on the bed, the officer asked the defendant how the killing occurred. The defendant told him he went to his mother-in-law's, picked his wife up and carried her away; that her brother objected and he drew a revolver on them; that she wanted him to shoot her and shoot himself; that he took her to the saloon and called a hack; that she took the revolver out of his pocket and shot herself. The testimony shows that the defendant had the only pistol in his possession when the parties got into the carriage, and that with this pistol Jennie Punshon met her death.

The testimony also shows that the deceased had repeatedly threatened to kill herself, and that she was in the habit of carrying a revolver. There was also evidence tending to contradict the witness, Miss Cooper, in her statement that the door was locked to the room in which she found the deceased at the mother's of defendant on the evening of the homicide, as well also as to several other matters.

The ball entered the right side of the head of deceased just back of the eye, passing through and lodging against the skin of the left side of the head, ranging in its course slightly upwards and backwards, from the effects of which she died a few minutes after she was shot, without ever having spoken.

The first contention is that the court committed error in refusing to permit defendant to prove the pleasant domestic relations that existed between defendant and deceased; what she said as to the cause of her absence from him; the threats to kill herself; the reason therefor; that she was an expert in the use of firearms and was in the habit of carrying a revolver.

It was entirely proper for the defendant to prove that his relations with his wife were of an affectionate character, and that he was an affectionate and devoted husband, in order to show the want of motive to commit the crime for which he was on trial. But such facts could not be shown by the statements of the wife, made before the homicide, for they were mere hearsay. The only authority to which our attention has been called as supporting the contention of counsel for defendant in this regard is *State v. Leabo*, 84 Mo. 168. In that case the defendant offered to read in evidence the letters of the deceased wife to a friend written from three to four months before her decease, containing expressions of great affection for her husband, which, upon objection by the state, were excluded by the court. Upon an appeal this court reversed the judgment of the court below and held that the letters should have been permitted to be read. The opinion is bottomed upon *State v. Watkins*, 9 Conn. 47; *State v. Green*, 35 Conn. 205; *People v. McCann*, 3 Park. Crim. Rep. 294; *People v. Williams*, 3 Park. Crim. Rep. 84; *Willis v. Bernard*, 8 Bing. 376; *Jacobs v. Whitcomb*, 10 Cush. 256; *Wal-*

*ton v. Green,* 1 C. and P. 621; and *Aveson v. Lord Kinnaird,* 6 East. 188.

In *State v. Watkins, supra,* it was held permissible for the state to prove, for the purpose of showing a motive for the murder of his wife, that some months before and up to that time an adulterous intercourse subsisted between him and a Mrs. B. And in the *Green case* the defendant was on trial for the murder of a woman to whom he had been married and with whom he was living as his wife, and the state was allowed to prove that he had a former wife still living; that he had married the deceased under a different name from that which he had before borne; that he had imposed upon her by false letters and papers, and that he married another woman five weeks after the death of the deceased.

In *People v. McCann, supra,* the state was permitted to prove that, in November, 1855, the wife made a complaint against her husband for an assault and battery, and on his trial for murdering her, several months thereafter, it was held that it "might properly be considered by the jury on the question of motive."

In *People v. Williams, supra,* it was held that the prosecution was properly permitted to prove that some time before the killing of the wife she had complained of her husband as a disorderly person, and that he was adjudged to pay two dollars weekly for her support.

The matters that were held to be admissible as evidence in each of those cases for the purpose of showing a motive for the killing, were *acts* of the deceased, not merely her statements, as in the case at bar. The other cases cited in support of the opinion were either actions for criminal conversation or civil actions growing out of the domestic relations of husband and wife, and exceptions to the general rule. It will thus be seen that the principal case is not supported by the author-

ities cited, nor any other authority that we have been able to find, and should be overruled.

The statements of the wife which were offered to be proven were not part of the *res gestæ* as exclamations of pain, nor were they with respect to her health as in *Regina v. Johnson*, 2 Car. & K. 354; *Goins v. State*, 21 N. E. Rep. (Ohio) 476; *State v. Moxley*, 102 Mo. 374 (see, also, 1 Greenleaf on Evidence [14 Ed.], sec. 102), and were properly excluded; and so were her statements to the effect that she intended to kill herself, for the same reasons. She was no party to the prosecution and the state was not bound by anything she may have said. *McMillen v. State*, 13 Mo. 31; *Commonwealth v. Densmore*, 12 Allen, 535; *State v. Nocton*, 121 Mo. 537. It will not be seriously contended that, if defendant's wife had been living and he had been indicted for assault with intent to kill her, anything she might have said in regard to their amicable relations would have been admissible against the state, and if not then admissible the fact that she was dead at the time of the trial did not make such statement permissible.

Nor do we think the court committed error in excluding the evidence which was offered by the defense tending to show that deceased was an expert with a pistol. It had no tendency whatever to show that she killed herself or to show that defendant was not guilty.

Another contention is that the court erred in instructing the jury on manslaughter in the first degree. That there was no evidence whatever upon which to predicate such an instruction is admitted by the attorney general in his printed brief, but he argues that, of this, defendant can not complain, because, we presume, of his conviction of a less offense than that for which he was indicted and put upon his trial. We do not understand this to be the law. While, by statute, it is

made the duty of the court to instruct upon every phase of the case warranted by the evidence, it is not its duty to instruct upon any grade of offense not authorized by the evidence, and it is error to do so. *State v. Allen*, 116 Mo. 548; *State v. Herrell*, 97 Mo. 105; *State v. Wilson*, 88 Mo. 13; *State v. Turlington*, 102 Mo. 642. In *State v. Starr*, 38 Mo. 272, it is said: "It is the duty of the court to instruct the jury with reference to the testimony in the case, and where the evidence all tends to prove one offense, it is wrong to mislead the jury by giving instructions in relation to a different one." The instruction only had a tendency to mislead the jury, which it is evident from the facts in this case, as disclosed by the record, it did do. Defendant was either guilty of murder in the first degree, or not guilty of any offense at all, and the instructions should have been confined to that offense.

Defendant asked the following instruction: "Before the jury can find the defendant guilty in this case they must believe from the evidence beyond all reasonable doubt that the defendant on or about the fifth day of January, 1894, at the county of Buchanan and state of Missouri, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, shot with a revolving pistol, and killed the said deceased, and unless the jury so find they will find the defendant not guilty and so return their verdict." The court modified the instruction by inserting, after the words "not guilty" "of murder in the first degree" and then gave it as modified, and in this it is urged error was committed. The instruction was evidently drawn upon the theory that defendant was either guilty of murder of the first degree or of no offense at all and the modification only made it more explicit and confined it to that offense, in which there was no error. It is not

at all applicable to any degree of manslaughter and was not before its alteration.

The fact that a note was found in the bosom of the deceased after her death could not, for the same reasons that exclude any statements she may have made, have been read in evidence, and was not a proper subject of comment by counsel before the jury, as nothing but vague and uncertain conclusions could have been drawn therefrom.

The conduct of the court with respect of remarks made by it in connection with various of its rulings during the trial and the treatment of counsel for defendant as well, is severely criticised by them in their brief, because of their effect upon the jury in prejudicing their minds against the defendant. Some of the remarks of the court as set forth in the bill of exceptions were unseemly, but evidently not intentionally so. Trials, especially of the character of this where a human being is upon his trial for his life, should be so conducted that no critic, however astute, could discern any feeling upon the part of the court, or anything that would have the slightest tendency to indicate that the scales of justice were not evenly and exactly balanced. It is to be hoped that upon another trial of the cause no one connected with it will have cause to complain of the action of the court in this regard.

The evidence tended strongly to show the defendant guilty of having willfully, deliberately and premeditatedly murdered his wife, and that unless he did do so, he was not guilty of any offense. The judgment is reversed and the cause remanded. All of this division concur.