SUPREME COURT.  Albany General Term, May, 1857.  *W. B. Wright, Harris* and *Gould,* Justices.

## FRANCIS McCANN, plaintiff in error, *vs.* THE PEOPLE, defendants in error.

Since the adoption of the Revised Statutes, a party who has brought a writ of error to reverse a judgment in a criminal case cannot allege diminution and sue out a *certiorari,* but the cause must be decided upon the return to the writ of errror, which return properly includes the pleadings, the bill of exceptions, if any, and the judgment; and when, on alleging diminution, a *certiorari* had been issued and return thereto had been made, the *certiorari* and return were struck out on motion.

Any irregularity, which cannot be made to appear in the return to the writ of error, can be made available on motion, in the court below, either to quash the indictment, or for a new trial or for other appropriate relief, according to the circumstances of the case.

Thus, if an error or irregularity has occurred in summoning or impanneling the petit jury, unless the defendant can present the objection in the form of an exception to some decision upon the trial, he must bring it before the court on a motion for a new trial.  He cannot make it the ground of reversing the judgment upon writ of error.

The statute requiring the District Attorney to issue a precept to the Sheriff, at least twenty days before the holding of a court of oyer and terminer, if it is at all applicable to the stated terms of such courts held under the Code, is merely directory, and an omission to issue it, inasmuch as it does not "tend to the prejudice of the defendant," will not invalidate the subsequent proceedings or judgment.

When, on the trial of a prisoner for the murder of his wife, the homicide was shown to have taken place on the 8th day of July, 1856, evidence on the part of the prosecution, given by a witness who had resided next door to the prisoner from the autumn of 1855 till the last week of May, 1856, showing that during all that time the prisoner had frequently had difficulty and quarreled with his wife, was held to be admissible, as showing an alienation of affection, and as authorizing an inference, in the absence of other evidence, that the same state of feeling continued to exist after the witness ceased to have an opportunity of observing it.

*Held,* also, that upon the question of motive, it was competent for the prosecution to prove that in November, 1855, the deceased made a complaint against the defendant for assault and battery, upon which he was arrested and an examination was had, and the defendant was held to bail.

The prosecution was also permitted to prove that the deceased had deposited money in the savings bank in the fall of 1855, and again in June, 1856, and that a bank-book was issued to her in her own name and left with

The People *v.* McCann.

her sister at Newburgh, and that the defendant complained that he had no money, and that his wife had taken the money and put it in bank, and that she had the bank-book, on the ground that such evidence tended to show both the existence and the source of the ill feeling of the defendant towards his wife.

Where a physician, who had heard all the evidence, and who saw and examined the defendant on the ninth day of July, two days after the homicide, had testified that the prisoner was then deranged, and that he thought *delirium tremens* was the cause of his insanity, and the court had not permitted the witness to answer whether, in his opinion, founded on such personal examination, the same state of mind had existed on the night of the seventh of July, or what was the state of the defendant's mind on the night of the seventh of July, but had permitted the witness to state how long he thought the defendant, when he saw him, had been in such a state of *delirium tremens*, it was held that no error had been committed.

Where the counsel for the defendant asked a medical witness, who had heard all the evidence, what, in his opinion, the facts stated by the witnesses on the trial, supposing them to be true, showed as to the state of the defendant's mind on the night of the seventh of July, when the homicide took place, and the evidence was excluded by the court, but at the same time the court decided that the witness might be asked his opinion upon a hypothetical case corresponding to the testimony, or that the testimony might be read to the witness and his opinion asked upon it, on the supposition that those facts were true, it was held that, inasmuch as the question permitted to be asked was substantially, in its effect and scope, like the one which had been excluded, no error had been committed. *Per* HARRIS, J.

What is the proper mode of examining a medical witness on a question of insanity, stated by HARRIS, J.

Where the presiding judge had charged the jury that the defence of insanity must be proved beyond a reasonable doubt, and if the defendant had satisfied them beyond a reasonable doubt, so that they should find that at the time of killing he was so far really insane as not to be responsible for the act, they should acquit him, but otherwise they must convict him, the charge was held not to be erroneous. (*a*)

Section three of chapter three hundred and thirty-seven of the laws of 1855, which authorizes an appellate court, on a writ of error from a court of Oyer and Terminer, to order a new trial, if it shall be satisfied that the verdict was against evidence, or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below, is inoperative and void, for the reason that it is in conflict with the sixteenth section of the third article of the constitution of this state, which delares that no local bill shall embrace more than one subject, and that that shall be expressed in the title. (*a*)

(*a*) On both these propositions the Court of Appeals differed from the Supreme Court, and reversed the judgment. (2 *Smith*, 58.)

ERROR to the Albany Oyer and Terminer.   The defendant had been indicted for the murder of his wife, and, upon being arraigned, had pleaded not guilty to the indictment. The issue was tried at the Albany Oyer and Terminer, in November, 1856, before Mr. Justice Gould and the associate justices.

On the trial, the killing of the deceased by the prisoner, on the morning of the 8th day of July, 1856, was not controverted, but the defence rested entirely on the ground that the prisoner was in a state of insanity at the time the homicide was committed.

Many witnesses were sworn and examined on the part of the people, but their evidence is not relevant to the exceptions taken.

It was proved that the deceased was seen alive on the evening of July 7th, 1856, and the next morning was found dead in the house occupied by her and the prisoner, with eight wounds upon her head, four of which were mortal. An axe and hatchet were found in the same room covered with blood.

*Jane Mitchell*, a witness sworn and examined on the part of the prosecution, before the people rested their case, testified as follows: I lived next door to the prisoner when he lived in John-street; he moved from that street to the place where the deceased died, the last week in May, 1856; I moved from that street last week in April, 1856.

The District Attorney then offered to prove by this witness that the prisoner had difficulty with his wife when he lived in John-street.   This evidence was objected to by the counsel for the prisoner, on the ground that it was too remote, and was immaterial.   The court overruled the objection, and the prisoner's counsel excepted.

Witness testified that the deceased, in the fall of 1855, came to the house of the witness; it was a very cold Saturday night; the prisoner came in after, at twelve o'clock at night, and began to jaw and scold and abuse her; he called

The People *v.* McCann.

her a whore, threatened to take us up for keeping her; she went after a policeman to have him taken; she came back and stayed all night; the next Monday she made complaint against him; I heard jawing all the next day between them in their room; heard them jawing and quarreling every week after; prisoner talked the most.

*S. H. H. Parsons*, a witness sworn and examined for the people, before the prosecution rested their case, testified as follows: I am one of the police justices of the city of Albany.

The District Attorney offered to prove by this witness that a complaint was made before him against the prisoner, by the deceased, in November, 1855, for an assault and battery. This evidence was objected to by the counsel for the prisoner, as being too remote, and otherwise improper and irrelevant. The objection was overruled by the court, and the counsel for the prisoner excepted.

Witness testified that Agnes McCann made a complaint against the prisoner for assault and battery, on the 26th day of November, 1855, upon which the prisoner was arrested and an examination was had; the prisoner was held to bail.

The last answer was objected to by the counsel for the prisoner, as being improper and irrelevant, but the objection was overruled by the court. To which decision the counsel for the prisoner excepted.

After the people rested their case, the counsel for the prisoner called and examined several witnesses upon matters not relevant to the exceptions taken.

Before the people rested their case, the District Attorney offered to prove that the deceased had deposited in her own name, in a savings bank at Newburgh, $250 in money, which was known to the prisoner, and which prisoner complained of.

This evidence was objected to by the counsel for the prisoner, as being improper and irrelevant, but the court decided that it was competent evidence to prove motive on the part of the prisoner, as well as difficulty between them.

to which decision the counsel for the prisoner then and there duly excepted.

It was thereafter proved that the deceased had deposited at one time, in the fall of 1855, $100, and in June, 1856, $150, in the said bank, to her own credit, and the bank-book therefor was issued in her own name; that the deceased left the bank-book with her sister in Newburgh; that the prisoner complained that he had no money; that what money there was his wife had taken to Newburgh and put in the bank, and she had the bank-book.

*Dr. Barent P. Staats*, a witness called, sworn and examined on the part of the prisoner, testified as follows: I am a physician and surgeon, and have practiced as such thirty-eight or thirty-nine years; I saw the prisoner at the station-house the evening of his arrest, July 9th, 1856; I conversed with and examined the prisoner at that time; I went into the place where the cell was; I have attended more than one hundred cases of *delirium tremens* within six years, in my own practice, at the alms-house and penitentiary; at the time I saw the prisoner at the station-house, I think he was deranged; I think it was *delirium tremens,* produced by previous drinking; I knew his habits of drinking; I supposed drinking was the cause of his insanity; I am not certain as to the cause; I have been present in court since the commencement of this trial, and have heard all the evidence given on both sides.

*Question* by prisoner's counsel. What, in your opinion, was the state of the prisoner's mind on the night of the 7th of July, 1856?

The question was objected to by the district attorney, and the objection sustained by the court; to which decision the counsel for the prisoner excepted.

*Question* by the counsel for the prisoner. What, in your opinion, founded on your personal examination of the prisoner on the night of the 9th of July, 1856, was the state

of the prisoner's mind on the night of the seventh of July preceding?

Objected to by the district attorney.

The court ruled that in this shape it called but for conjecture and could not be asked, but that the question might be asked, how long the witness thinks the prisoner had then (when he saw him) been in the state of *delirium tremens;* to which decision the prisoner's counsel excepted.

*Question* by counsel for the prisoner. What, in your opinion, do the facts stated by the witnesses on the trial, supposing them to be true, show as to the state of the prisoner's mind on the night of July 7th, 1856, the time his wife was killed?

Objected to by the district attorney, and the court ruled, that it seemed impossible to ask this question without allowing the witness to answer, in fact, on his own impression of the truth of the evidence. The court permitted the counsel to ask his opinion on a hypothetical case, corresponding to the testimony, or by reading to him the testimony and asking him, on the supposition that those facts are true, and so excluded the question; to which decision the counsel for the prisoner then and there excepted.

The prisoner's counsel then put the following question to the witness:

*Question:* Suppose the case of a man who was accustomed to the excessive use of spirituous liquors, and had been a considerable period of time; he possessing a nervous and excitable temperament; he has had difficulties with his wife; and is seen at times running away as if to escape from officers, saying they are after him when they are not; he is frequently heard falsely accusing his wife of intimacy with other men, and with being drunk, and a drunken woman; he and his wife are about to separate by mutual consent; on the third of July, and for several days after he drinks freely and to excess, of liquors which are in his house; on the fifth of July he is seen with eyes bloodshot; on the

night of July seventh the prisoner is seen apparently sober with his face resting upon his hands, and buys a candle about nine o'clock at night; on the morning of July eighth he is seen coming from his house at six o'clock, and states to persons that he meets that he has had a hard night; that two or more men came to his house. in the night-time and were with his wife; and that a fight ensued with axes, in which he killed one or more of the men, and that he also killed his wife; and that afterwards they came and carried away the persons killed; that he goes into the city among persons who knew him well, in his shirt sleeves, and remains until about half-past seven; he then borrows a penny of a boy, telling him not to mention the fact that he had seen him; he is proved to have in his possession, at six o'clock, four cents; he crosses the ferry to a neighboring village and is found concealed in a cellar on the afternoon of the ninth, and on being arrested, makes similar statements in regard to the transaction on the night of the seventh, and states that he has wounds on his person received in the fight, which statement is untrue. Prior to the alleged killing he is seen at times striking against a wall at some person supposed to be present, when there is no one to be struck; his wife is found on the morning of July eighth, dead, with wounds on her head (four of them mortal), which were occasioned by one or more axes, and in the same room are found an axe and a hatchet covered with blood; the axes plain to be found, although one is partly covered with a bundle:

What, in your opinion, do these facts show in regard to the state of the prisoner's mind at two or three o'clock on the night when the woman is supposed to have been killed? The court decided that the question might be asked.

*Answer:* I should think he was insane.

*Alexander H. Hoff*, a witness sworn and examined for the defence, testified that he was a physician, and had been in practice since 1845; that he had been in court since

the commencement of the trial and had heard the whole evidence.

The same questions as were asked of Dr. Staats were asked of the witness, by prisoner's counsel, and the same rulings thereon were made by the court, and the same exceptions taken by the prisoner's counsel.

At the request of the prisoner's counsel the presiding judge charged the jury that, if they were satisfied from the evidence that at the time the alleged offence was committed, the prisoner, in consequence of partial insanity, was laboring under such defect of reason as not to be conscious of the nature, character and consequences of the act, or not to know that the act was wrong, he should be acquitted; that if by reason of *delirium tremens* he believed, when he committed the act, that he was defending himself in a supposed fight with men who were his enemies, such delusion would release him from criminal responsibility for the act committed under its influence; that, in determining the question of insanity, the jury may consider the previous intemperate habits of the prisoner, the circumstances connected with the commission of the alleged offence, so far as they are disclosed, the conduct and declarations of the prisoner before and after the offence was committed, and the opinion of the medical witnesses.

The presiding judge further charged the jury (among other things) that insanity, whether *delirium tremens* or any other species, might be proved in either of two ways, besides the direct proof of fact showing it to the jury: First (and most directly). By absolute opinions of medical men, founded on their own examination of the person and sworn to before the jury; Second. By proof (satisfactory to the jury) of facts such as are symptoms or characteristics of the disease, and then by competent medical opinions that those facts (if proved) show insanity.

The medical gentlemen, in the latter case, do not find the facts. That you must do, before their opinions become

applicable to the case; when you have so found the facts those opinions become evidence; evidence, on the accuracy and weight of which, as of other testimony, you pass.

. Guided by these rules, you will inquire, was the prisoner so insane (from any cause) that at the time of the killing he did not know the act he was doing to be wrong, and to assist you in this inquiry you will also inquire (and the evidence has been admitted for the very purpose of enabling you to inquire) was he from any cause insane, before or after the act, and if so, either before or after or both, was the insanity of so permanent or continuing a kind, that it extended to and existed at the time of killing? If you find it did so, you acquit.

:, The fact of the killing is admitted; that the act was done by the prisoner is not disputed. Thus the issue is really reversed from the usual one. The question of his insanity is a matter of positive defence, and is a defence to be affirmatively proved, and a failure to prove it is (like the failure to prove any other fact) the misfortune of the party attempting to make the proof; and in this case, as in all cases of fact, you are not to presume what has not been proved, under the distinctions and upon the principles already given you. The act being plainly committed, and that the prisoner did it being undoubted, and the defence set up on his part, that he was insane, the burden of the proof is shifted. In the proof of the deed itself, if any reasonable doubt be left on your minds, the prisoner is to be acquitted. But as sanity is the natural state there is no presumption of insanity, and the defence must be proved beyond a reasonable doubt. If (canvassing the whole evidence on the legal principle laid down in the charge) the prisoner has satisfied you so far beyond a reasonable doubt that you find that he was, at the time of the killing, as far really insane as not to be responsible (under the distinctions stated to you) for this particular act, you acquit, otherwise you convict.

The People *v.* McCann.

The jury having found the defendant guilty, he was sentenced to be executed on the 23d of January, 1857. A bill of exceptions having been made by the defendant, a writ of error was allowed by the presiding justice, with a stay of proceedings upon the judgment.

The clerk having made his return to the writ of error, the defendant's attorney issued a writ of *certiorari*, directed to the judges of Oyer and Terminer, requiring them to certify " whether a *venire* or precept was issued by the district attorney of the county of Albany to the sheriff of the county of Albany, to summon the grand jurors by whcm a certain indictment for the crime of murder was presented to our said court of Oyer and Terminer against Francis McCann, or whether such or any *venire* or precept was served by said sheriff for said grand jury, or whether any return of such *venire* or precept has ever been made by such sheriff, and also, whether a *venire* or precept was issued by the district attorney of the said county of Albany to the sheriff of the said county of Albany to summon the petit jurors from whom the jury was formed by which the said Francis McCann was tried and convicted, and whether such or any *venire* or precept was served by the said sheriff upon the said petit jurors or returned by him ; or whether the petit jurors by whom the said Francis McCann was tried and convicted, or part of them, were drawn by the clerk and summoned by the sheriff of the county of Albany, in pursuance of an order of the court of Oyer and Terminer, directing the sheriff to summon sixty additional jurors to be drawn by the clerk in the usual way.

" To this writ the clerk made a return as follows : In obedience to the writ of *certiorari*, served upon me in the above entitled action, I do hereby make return thereto as follows :

" 1. As to whether a *venire* or precept was issued by the District Attorney of the county of Albany to the sheriff of the county of Albany to summon the grand jury by whom

a certain indictment for the crime of murder was presented to our court of Oyer and Terminer against Francis McCann, I return that I have no knowledge.

"2. As to whether such *venire* or precept was served by said sheriff upon said grand jurors, I return that I have no knowledge.

"As to whether any return to such *venire* or precept has been made by said sheriff, I return that I have examined the records and files in my office, and I find that no such *venire* or precept has been returned and filed in my office.

"4. As to whether a *venire* or precept was issued by the district attorney of Albany county to the sheriff of said county, to summon the petit jurors from which the jury was formed by which the said Francis McCann was tried and convicted, or whether the same was issued either for the original Oyer and Terminer, held in Albany county in September, 1856, or for the adjourned Oyer and Terminer, held in November, 1856, I return that I have no knowledge.

"5. As to whether such *venire* or precept was served by said sheriff upon the said petit jury, or the petit jury for either of said courts of Oyer and Terminer, I return that I have no knowledge.

"6. As to whether such *venire* or precept, or any *venire* or precept from the district attorney to the sheriff, for either of said courts of Oyer and Terminer, has been returned by said sheriff, I make my return that I have examined the records and files in my office, and find that no such *venire* or precept has been returned or filed in my office.

"7. As to the authority for summoning the petit jurors who tried and convicted the said Francis McCann for murder, I return that the thirty-six jurors were drawn and summoned for the original Oyer and Terminer, held in September, 1856, in the usual way. That at the said September term an order was entered adjourning the said court to November 10, 1856, and a further order was also granted by said court and filed with me, of which the following is a copy:

The People *v.* McCann.

" ' *Albany County Oyer and Terminer*, 1856, *Sept.* 23.—The court order that the sheriff of the city and county of Albany summon, for the adjourned term of the court, to be held on the tenth day of November next, at ten o'clock, A. M., sixty additional jurors, to be drawn by the clerk in the usual way.'

" That, in pursuance of such order, I proceeded to draw, and did draw, the names of sixty jurors, in the same manner that the statute requires the names of thirty-six jurors to be drawn for every Circuit Court; that the names of the said sixty jurors were given to the sheriff of said county to be summoned, and at the adjourned Court of Oyer and Terminer, held in November, 1856, twenty-two of said sixty jurors, so drawn as aforesaid, attended as jurors, and sixteen of the original thirty-six jurors, drawn and summoned for the September Oyer and Terminer, also attended as jurors, and the jury by which Francis McCann was tried and convicted was composed partly of said sixteen jurors so attending as aforesaid, and partly of the twenty-two persons so drawn with the sixty as aforesaid."

The district attorney gave notice of a motion to strike out the *certiorari* and the clerk's return thereto, which motion was argued at the same time with the questions arising upon the bill of exceptions. The questions thus arising sufficiently appear in the opinion of the court.

*L. Tremain* and *R. W. Peckham,* for the defendant.

I. The conviction should be reversed, because there was no precept issued by the district attorney to the sheriff. (*McGuire* v. *The People,* 2 *Park. Cr. R.,* 148; *People* v. *McKay,* 18 *John.,* 212; 2 *R. S.,* 438, § 69; *id.,* 206, §§ 37, 38; *id.,* 440, §§ 75, 77.) In a capital case a prisoner waives nothing. (18 *John.,* 212; 24 *Wend.,* 566.) The principle of " *stare decisis* " requires that this rule should not be reversed.

(2 *Park. Cr. R.*, 636; 3 *Barb.*, 473; 2 *Kern.*, 233; *Jewett* v. *Van Rensselaer*, 2 *Comst.*, 139, 140.) Our criminal statute of *jeofails* only reaches defects in° the indictment itself. (1 *Whart. Cr. L.*, 98, 99.)

II. The conviction should be reversed, because the order of the Oyer and Terminer, directing the sheriff to summon sixty additional persons to be drawn by the clerk, was wholly illegal. (2 *R. S.*, 417, § 41; *id.*, 419, § 54; *The People* v. *Thurston*, 2 *Park. Cr. R.*, 53.) Trials can only be had before persons summoned as required by law. (2 *R. S.*, 419, § 53.)

III. These errors are properly brought up by *certiorari*. (2 *Park. Cr. R.*, 148; 2 *R. S.*, 599, § 45; 7 *Wend.*, 478.) 1. They are irregularities. (3 *Chitty Gen. Pr.*, 509; *Burr. L. Dic.*, "*Irregularity.*") 2. They are errors apparent in the record, and therefore the court has no discretion as to whether they shall be corrected. (7 *Wend.*, 427, *and cases cited;* 17 *Mass.*, 534, 535.)

IV. The court erred in receiving evidence that deceased and wife had a difficulty eight months prior to the homicide; also, in admitting proof that the deceased made complaint against him for it; and especially in receiving proof that, after examination, the prisoner was held to bail. 1. It is enough to set aside a conviction, that the proof may have had an injurious effect. 2. Here, proof of a decision by the court against the prisoner in an assault and battery is received, and that, too, eight months before trial; why not on this principle, receive proof of his conviction of any offence, although no proof is offered on his part as to character?

V. The learned judge erred in receiving proof that the deceased had money in bank, as competent evidence to prove motive. 1. The ruling under the old law would have been correct. (2 *R. S.*, 74, § 30.) 2. Under the act of 1848 and 1849, the property would pass to the wife's heirs and not to her husband.

The People v. McCann.

VI. The learned judge erred in excluding the opinion of Dr. Barent P. Staats, as to the state of the prisoner's mind, on the night of July 7th, 1856; also in excluding his opinion founded on his personal examination on the ninth of July. 1. Such examination was regarded by the judge as a material mode of proving insanity. 2. The opinion was competent evidence. ( *The People* v. *Freeman*, 4 *Denio*, 17, 40.) 3. The privilege given by the court did not change the matter. If the question is proper, counsel had a right to put it. Besides, the privilege assumes that the only insanity was *delirium tremens*, whereas the testimony was, that the witness was not certain as to the cause, but did think he was then deranged. Again, the witness might easily have formed an opinion that the prisoner was deranged thirty-six hours before, and yet been unable or unwilling to give an opinion how long the prisoner had been deranged.

VII The learned judge erred in excluding the opinions of Drs. Staats and Hoff, who had heard the whole evidence in the case, and were asked to give an opinion, assuming, as the basis of the opinion, that the facts stated by the witnesses were true. ( *The People* v. *Thurston*, 2 *Park. Cr. R.*, 53, *and cases cited.*)

VIII. The learned judge erred in charging that the defence of insanity must be proved beyond a reasonable doubt, or they should convict. 1. If the jury had reasonable doubt of sanity, they should acquit. ( *State* v. *Marler*, 2 *Ala.*, new series, 43; *Barb. Cr. L.*, 245. 2. The principle of humanity on which the rule as to reasonable doubt is founded, applies with peculiar force to a case where the jury is in doubt as to the prisoner's sanity. In the language of the Alabama court, " can the court repose upon a verdict that was rendered by a jury, every member of which may have had a reasonable doubt of the prisoner's sanity?" 3. In this case the prisoner is required to prove a defence by stronger evidence than any other defence known to the law, and yet from its very nature it is a

defence the most difficult to be established. 4. If this charge was erroneons, the prisoner is entitled to a new trial whether an exception was taken or not. (*Laws of* 1855, *ch.* 337, § 3.)

*Hamilton Harris*, for the people.

I. The *certiorari* and return thereto should be disregarded by this court. 1. They form no part of the record, and are not brought up by the writ of error. The clerk is required to return to writs of error, on judgments in criminal cases, "a transcript of the indictment, bill of exceptions and judgment of the court, certified by the clerk thereof," and the court of review is required to "proceed on the return and render judgment upon the record before them." (2 *R. S.*, 741, §§ 20, 23.) The court of review is confined to such errors as appear upon the face of the indictment or in the bill of exceptions. 2. They are unauthorized by law.

II. If the *certiorari* and return are properly before the court, yet they present no reason for a reversal of the conviction. 1. The omission of a precept from the district attorney to the sheriff to summon the grand and petit jurors is no ground for a new trial. (1.) The indictment was found at a Court of Sessions. A precept is never necessary in that court. (2 *R. S.*, 724, § 25.) (2.) A precept is only required for special or extraordinary terms of Oyer and Terminer and jail delivery, appointed by the special commission of the governor or the warrant of the circuit judge. (2 *R. S.*, 205, §§ 32–37.) Circuit Courts and Courts of Oyer and Terminer shall be held at the same places and commenced on the same day. (*Code*, § 21.) Juries are drawn and summoned only for Circuit Courts and special courts of Oyer and Terminer. (2 *R. S.*, 413, § 24.) Where a Court of Oyer and Terminer shall be held at the same time with any Circuit Court, the jurors returned for such Circuit Court shall be the jurors for such Oyer and Terminer. (2 *R. S.*, 733,

§ 2.) Therefore a requirement upon the sheriff to summon jurors for a stated Oyer and Terminer would be contrary to the statute and an idle ceremony, as there are no jurors drawn for such Oyer and Terminer, and hence none to summon. (3.) The statute, as to precepts, is merely directory. The issuing of a precept is a matter of form. The omission of it could not, in any manner, prejudice the rights of the prisoner. Hence it is not an irregularity of which advantage can be taken. (*The People* v. *Ransom*, 7 *Wend.*, 417.) The duties of the sheriff are the same, whether a precept is issued or not. Its function is simply to ask the sheriff to do what, by law, he is bound to do without being asked. Provision is made for drawing jurors. (2 *R. S.*, 413, § 24.) A certified list of the names is to be delivered to the sheriff, who is required to summon the persons named in such list and to make his return thereon to the court. (2 *R. S.*, 414, §§ 29, 30 ; *id.*, 722, §§ 11, 12.) (4.) The case of *The People* v. *McGuire* (2 *Park. Cr. R.*, 148) based the decision on the case of *The People* v. *McKay* (18 *John.*, 212), which was a case of the want of a *venire*, and not of a precept, and was previous to the Revised Statutes. The court, in *The People* v. *McGuire*, confounded the distinction between a *venire* and a precept. If, however, a precept is to be taken to be a *venire*, as was done in the *McGuire case*, then the Revised Statutes have abolished it wholly for any regular Oyer and Terminer. (2 *R. S.*, 410, § 9.) (5.) The clerk's answer, in the return to the *certiorari*, that he finds no precept on file, furnishes no evidence that none was issued. No return or filing of a precept is required by the statute. 2. There was no error in the order for additional jurors. (2 *R. S.*, 733, § 3; *The People* v. *Colt*, 3 *Hill*, 432.) The direction that the jurors to be summoned "be drawn by the clerk in the usual way," is only equivalent to an order to summon, in the words of the statute, "from the county at large." 3. No objection or exception was taken, before conviction, on the ground that a precept had not

been issued, or to the order or the drawing of the additional jurors. It is too late to raise the questions after conviction. They at most were mere irregularities, working no injustice. (*The People* v. *Robinson*, 2 *Park. Cr. R.*, 234; *State* v. *Bird*, 14 *Georgia*, 43; *State* v. *Brown*, 7 *English*, 623.) 4. Neither the precept nor the order for additional jurors form any part of the judgment record. The error, if any, in order to avail anything to the prisoner, must appear upon the face of the record. Hence, after conviction, neither the want of a precept nor an irregularity in the order for jurors is the subject of review. (1.) That the error upon which motion in arrest of judgment and motion for reversal on error may be grounded should appear on the face of the record is well settled. (*Arch. Cr. Pl.*, 6th ed., 193; *Vermilyea case*, 6 *Cow.*, 555; *S. C.*, 7 *id.*, 108–137.) (2.) The precept is not necessarily or properly a part of the record. The statute requires no return. It is not, in its form or body, returnable. It is simply a command upon the sheriff to do what the law has elsewhere imposed upon him. No return was necessary in order to predicate any future action or proceeding. (*Collin* v. *State*, 2 *Stewart*, 388; *McKinney* v. *The People*, 2 *Gilman*, 540.) (3.) The order at the September Oyer and Terminer was to summon sixty additional jurors for the adjourned Oyer and Terminer generally, and not for this case particularly. Therefore it enters not into the record of judgment in this case. The record of judgment in a criminal case consists of what transpires in that case especially, and not of the general business of the court. Otherwise, no record would be complete without the whole history of the court and its transactions. (*Harriman* v. *State*, 2 *Iowa*, 270; *U. S. Cr. Dig.*, 411.) 5. If there be a defect or imperfection, either in the omission of a precept or in the order for additional jurors, it was a defect in matters of form, not tending to the prejudice of the prisoner, and is therefore covered by the statute of *jeofails*. (2 *R. S.*, 728, § 52.)

The People *v.* McCann.

III. The difficulties between the prisoner and his wife during the fall, winter and spring previous to her death, and the complaint made by her against him at the police court, were properly admitted in evidence. They showed the prisoner's feelings towards his wife; the enmity which he bore her, and conduct on her part kindling hatred in his breast towards her. The evidence tended to repel the presumption of innocence, arising from the conjugal relation. (*People* v. *Hendrickson*, 1 *Park. Cr. R.*, 406–416.)

IV. The proof that deceased had deposited money in her own name, in a savings bank, was properly received. It not only bore upon the question of motive, but gave rise to complaints and ill-will on the part of the prisoner towards his wife.

V. The questions asking the opinion of the medical witnesses what the state of the prisoner's mind was on the night of the 7th of July, 1856, and also what, in their opinion, the facts stated by the witnesses, supposing them to be true, showed as to the state of his mind at that time, were properly excluded. The answer to either question would have transferred the witness from his stand to the jury box. Both questions called for an opinion upon the whole testimony, whereas the jury might find a portion untrue, and, perchance, that portion which tended most strongly to form the witness' opinion. (2 *Greenl. Ev.*, § 373, *note; McGlue's case*, 1 *Curt.*, 1; *McNaughton's case*, 47 *Eng. Com. L. R.*, 129, *note.*)

VI. The question asking the opinion of the medical witness, from his examination of the prisoner on the night of the ninth of July, as to the state of his mind on the night of the seventh of July, was properly excluded. 1. It called for mere conjecture, and not for an opinion founded upon certain principles, or which could be tested by knowledge. (*Whart. Am. Cr. L.*, 94.) 2. The question permitted by the court, in place of the one asked, called for the only

opinion of the witness which could be tried by professional skill and judgment.

VII. There was no error in the charge of the judge. (*State* v. *Spencer*, 1 *Zabriskie*, 186 ; *McNaughton's case*, 10 *Clark & Fin.*, 200 ; 47 *Eng. Com. L. R.*, 134, 135.) No exception was taken to the charge, or any part of it, on the trial. Therefore, none can be taken now. The third section of the act of 1855, entitled " An act to enlarge the jurisdiction of the courts of General and Special Sessions of the Peace in and for the city and county of New-York," is void. That section relates to " the courts of Oyer and Terminer in this state." The subject of that section differs from that of the other sections in the act, and is not expressed in the title of the act. Therefore, it is in direct conflict with the constitution. (*Laws of* 1855, 613 ; *Const.*, art. 3, § 16.)

HARRIS, J.—The mode of proceeding upon a writ of error, in a criminal case, is prescribed and governed by the provisions of the Revised Statutes relating to writs of error on judgments and *certioraris* in criminal cases. (2 *R. S.*, 739.) The clerk is required, upon the writ being filed, to make a return thereto, and the contents of this return are specified. It must contain " a transcript of the indictment, bill of exceptions and judgment of the court, certified by the clerk thereof." The court of review is required, without assignment of error or joinder in error, to proceed on the return and render judgment upon the record before them. (2 *R. S.*, 741, §§ 20, 23.) The record before the court contains the indictment and bill of exceptions, together with the judgment of the court below. Upon this record the court of review is required to render judgment. It must, therefore, be confined to the examination of such errors as appear upon the face of the indictment or in the bill of exceptions. Other errors must be corrected in the court where the trial is had. If any error or irregularity has occurred in the organization of the grand jury, the objection

should be taken upon a motion to quash the indictment, or perhaps by plea. After pleading in bar to the charge, it would be too late to raise the question. (*The People* v. *Robinson*, 2 *Park. Cr. R.*, 308, *and cases there cited.*) If any error or irregularity has intervened in summoning or impanneling the petit jury, the defendant, if he would avail himself of the objection, unless he can present the question in the form of an exception to some decision upon the trial, must bring it before the court upon a motion for a new trial. He cannot make it a ground of reversing the judgment upon error.

Before the adoption of the Revised Statutes, the practice upon bringing error in criminal cases was similar to that in civil actions. The plaintiff in error, if he relied upon any error which did not appear upon the face of the record, might, in a special assignment of errors, allege diminution and pray for a *certiorari*. (*Pelletreau* v. *Jackson*, 7 *Wend.*, 478; *Lambert* v. *The People*, 7 *Cow.*, 103.) Upon the revision, this practice was retained in civil cases (2 *R. S.*, 599, § 45), but, as we have seen, it was no longer applicable to criminal cases.

In *McGuire* v. *The People* (2 *Park. Cr. R.*, 148), the plaintiff in error, after a general assignment of errors, made a special assignment and alleged diminution. A *certiorari* was issued, to which the clerk made a return, which has evidently been used as a precedent for the return in this case. The district attorney joined in error, and the plaintiff demurred to the joinder. The district attorney joined in demurrer, and the case was argued upon the issue thus made. There was no bill of exceptions in the case, nor is there in the report of the case any allusion to the change made by the Revised Statutes in the mode of reviewing judgment in criminal cases. The case was conducted throughout according to the common law practice, and that, too, without objection. In this respect, it stands alone. No other case will be found in which " the out branches of the record "

have been brought up by *certiorari* for the inspection of an appellate court, since the Revised Statutes took effect.

By the fifty-second section of the article relating to "indictments and proceedings thereon" (2 *R. S.*, 728), it is declared that no indictment shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect or imperfection in matters of form, which shall not tend to the prejudice of the defendant. Now, if it be assumed that by some inadvertence or oversight the provision of the statute (2 *R. S.*, 206, §§ 37, 38) requiring the district attorney to issue a precept at the time and in the manner specified, commanding the sheriff to summon the several persons who shall have been drawn in his county pursuant to law to serve as grand and petit jurors at any Court of Oyer and Terminer and jail delivery in his county, is still unrepealed, can any one conceive of a proceeding more completely a matter of form than the issuing of such a precept? Is it possible for the defendant to be prejudiced by the omission of the district attorney to issue such a precept? Provision is made by law for drawing both the grand and petit jurors. A certified list of the names is to be delivered to the sheriff, who is required to summon the persons named in such list, and to make his return thereon to the court. (2 *R. S.*, 414, §§ 29, 30; *id.*, 808, §§ 11, 12.) No *venire* need be issued. (2 *R. S.*, 410, § 9.) The jurors returned for the Circuit Court are jurors for the Oyer and Terminer. (2 *R. S.*, 733, § 2.) Whether, therefore, a precept is issued or not, the duties of the sheriff in respect to the summoning of the grand and petit jurors are the same. The only return he is required to make, or upon which the court is authorized to act, is upon the certified list delivered to him by the clerk. The issuing of the precept is but an idle ceremony. It in no way affects the duties of the sheriff or the rights of the defendant. There is no law recognizing that it should be returned; and the fact that the clerk certifies that, upon search, he finds no

The People *v.* McCann.

such precept on file in his office, furnishes no legal evidence that none was issued.

Before the adoption of the Revised Statutes, a *venire* was necessary in all cases, civil and criminal. The want of it was deemed sufficient ground for reversing the judgment in *The People* v. *McKay* (18 *John.*, 212). The learned judge who pronounced the opinion of the court in *McGuire* v. *The People*, overlooking the distinction between a precept and a *venire*, as well as the fact that the mode of proceeding in such cases has been entirely changed by the Revised Statutes, seems to have regarded the case of *The People* v. *McKay* as controlling authority upon the question whether the omission to issue a precept was ground for the reversal of a judgment.

I am inclined to regard the language of the section requiring the district attorney to issue a precept to the sheriff at least twenty days before the holding of a court of Oyer and Terminer as sufficiently broad to make it applicable to all such courts; but as it is a matter which can in no possible manner concern the parties to be tried at such court, or indeed, anybody else, and as the duties of the sheriff are in all respects the same, whether the precept is issued or not, I regard the provision, like that which requires the sheriff to make proclamation before the sitting of the court, and other hundred provisions, as merely directory, and that, therefore, an omission to obey such directions does not invalidate the judgments rendered at such courts. But even if this were not so, the only way in which advantage could be taken of the want of such a precept would be by a motion in the same court to quash the indictment, or for a new trial, or in arrest of judgment, according to the circumstances. Upon *certiorari* or error, this court could only reverse for such errors as appear upon the face of the indictment or in the bill of exceptions. The motion to strike out the *certiorari* and the clerk's return thereto should, therefore, be granted.

It only remains to consider the grounds of error alleged in the bill of exceptions. The defendant was tried for the murder of his wife. The homicide took place on the 8th of July, 1856. It was proved that, until the last week in May, the defendant and the deceased had lived in John-street, in the city of Albany. The district attorney then offered to prove, by a witness who resided next door to the defendant, that when he lived in John-street he had difficulty with his wife. The evidence was objected to by the counsel for the defendant as immaterial. The court overruled the objection, and the counsel for the prisoner excepted. The witness then testified that the deceased, in the fall of 1855, came to her house; that it was on a very cold Saturday night; that the defendant came in after her at twelve o'clock at night, and began to jaw and scold and abuse her; called her a whore; threatened the witness for keeping her; that the deceased went after a policeman to have him taken; that she came back and stayed all night; that the next Monday she made complaint against him; that the witness heard jawing all next day between them, in their room; that she heard them jawing and quarreling every week after; that the defendant talked the most.

The evidence was clearly admissible. It tended to show an alienation of affection. (*The People* v. *Hendrickson*, 8 *How.*, 412.) Nor was the time mentioned by the witness so remote from the homicide as to render the testimony irrelevant. If the parties were "jawing and quarreling" from November until April or May, it would not be very unreasonable for the jury to infer that the same state of feeling continued until July.

The district attorney offered to prove, by one of the police justices of the city, that in November, 1855, the deceased had made a complaint against the defendant for an assault and battery. This evidence was objected to by the counsel for the defendant as being too remote and otherwise improper and irrelevant. The objection was overruled and the

counsel for the defendant excepted. The witness testified that the deceased made a complaint against the defendant for assault and battery on the 26th of November, 1855, upon which he was arrested and an examination had; that the defendant was held to bail. The last answer was objected to by the counsel for the defendant, as being irrelevant, but the objection was overruled and an exception was taken. The testimony was properly received. It tended to show the extent of the difficulty between the parties. The evidence might properly be considered by the jury on the question of motive. (*People* v. *Hendrickson,* 9 *How.,* 165.) "Considerable latitude," says Parker J., in delivering the prevailing opinion in the Court of Appeals, "is allowed on the question of motive. Just in proportion to the depravity of the mind, would a motive be trifling and insignificant which might prompt to the commission of a great crime."

The district attorney proved that the deceased had deposited at one time, in the fall of 1855, $100 to her own credit in a savings bank in Newburgh, and in June, 1856, $150 more; that a bank-book was issued in her own name and left with her sister in Newburgh; that the defendant complained that he had no money; that what money there was his wife had taken to Newburgh and put in the bank, and she had the bank-book. This evidence was objected to as improper and irrelevant, but the objection was overruled and an exception was taken. The objection was not well taken. The evidence showed not only the existence, but one of the sources of the ill feeling of the defendant towards his wife.

A physician was called by the defendant, who testified that he saw the defendant on the evening of the ninth of July; that he went into his cell and conversed with him; that he thought he was then deranged; he thought it was *delirium tremens,* produced by previous drinking; that he knew defendant's habits of drinking, and supposed drinking was the cause of his insanity; that he was not certain as to the cause; that he had been present and heard all the

evidence given upon the trial. He was then asked by the counsel for the defendant what, in his opinion, was the state of the defendant's mind on the night of the 7th of July, 1856. The question was objected to by the district attorney, and the objection was sustained. The counsel for the defendant excepted to the decision. The witness was then asked what, in his opinion, founded on his personal examination of the defendant on the night of the ninth of July, was the state of his mind on the night of the seventh of July preceding. The question was objected to by the district attorney. The court sustained the objection, on the ground that it called but for conjecture, but allowed the witness to state how long he thought the defendant, when he saw him, had been in a state of *delirium tremens.* The defendant's counsel excepted to the decision.

I think it was competent for the defendant's counsel to have the opinion of the witness as to the state of the defendant's mind at a time anterior to the time of the examination upon which the opinion is founded. The witness had examined the defendant two days after the homicide. He had testified that, in his opinion, he was then deranged, and that he thought *delirium tremens* was the cause of such insanity. The defendant had a right to pursue this inquiry, and to have the opinion of the witness whether the state of mind in which he found the defendant on the evening of the ninth of July had existed on the evening of the seventh of July. Had the court excluded this evidence altogether, I should have deemed the decision erroneous. But the court merely excluded the question in the form in which it was put to the witness, at the same time allowing him to state how long, in his opinion, the defendant had been in a state of *delirium tremens* when he saw him. The difference between the question as it was put to the witness by the defendant's counsel, and the form in which it was allowed to be put by the court, is very slight indeed. It was quite immaterial, as it seems to me, in which form the inquiry

The People *v.* McCann.

was presented. So long as the defendant's counsel was permitted to inquire of his witness how long, in his opinion, the state of mind in which he found him on the evening of the ninth of July had continued, I cannot see that he had any reason to complain of the decision. ( *The People* v. *Freeman*, 4 *Denio*, 40. )

The counsel for the defendant asked the same witness what, in his opinion, the facts stated by the witnesses on the trial, supposing them to be true, showed as to the state of the defendant's mind on the night of the seventh of July, the time his wife was killed. The question was objected to by the district attorney and excluded by the court. But at the same time the court decided that the witness might be asked his opinion upon a hypothetical case corresponding to the testimony, or by reading him the testimony and asking for his opinion, on the supposition that those facts were true. The defendant's counsel excepted to the decision. I am utterly unable to distinguish between the question excluded by the court and those which were allowed. The witness was asked his opinion upon the facts stated by the witnesses, supposing them to be true. This he was not allowed to state, but at the same time the court allowed the defendant's counsel to suppose a case corresponding with the testimony and ask the witness his opinion opon such supposed case, or to read to the witness the testimony, and ask him, upon the supposition that those facts were true, what would be his opinion. I cannot see that by this decision the court excluded any evidence to which the defendant was entitled.

The examination of a medical witness, for the purpose of obtaining his opinion upon the facts developed upon the trial, is attended with some difficulty. If, as was proposed in this case, the witness is asked his opinion as to the state of mind of the defendant, upon the supposition that everything stated by the witnesses is true, it may happen that the jury will believe only a part of the testimony. In such a case it is obvious that the opinion of the witness

would be inapplicable to the facts found by the jury. The question that was put to the physician in this case, and upon which he gave his opinion, embraced more than twenty distinct facts which had been mentioned by the witnesses in the progress of the trial. Assuming all these to be true, the witness said he should think the defendant insane. But suppose the jury believe some of them to be true and others not, it follows that they have no opinion upon the actual state of facts found by them. The proper mode of examining such a witness is, in my judgment, first to inquire of him as to the particular symptoms of insanity, asking whether all or any, and which, of the circumstances spoken of by the witnesses upon the trial are to be regarded as such symptoms, and then to inquire of him whether any and what combination of these circumstances would, in his opinion, amount to proof of insanity. (*Wharton's Am. Cr. L.*, 94.)

The presiding judge charged the jury that if they were satisfied from the evidence that, at the time the alleged offence was committed, the prisoner, in consequence of partial insanity, was laboring under such a defect of reason as not to be conscious of the nature, character and consequences of the act, or not to know that the act was wrong, he should be acquitted ; that the fact of the killing was admitted, and that the act was done by the defendant was not disputed, and thus the issue was really reversed from the usual one.

The judge further charged that insanity is a defence to be affirmatively proved ; that a failure to prove it, like a failure to prove any other fact, is the misfortune of the party making the attempt to prove it ; that as sanity is the natural state, there is no presumption of insanity, and the defence must be proved beyond a reasonable doubt ; that if the defendant had satisfied them beyond a reasonable doubt, so that they should find that at the time of killing he was so far really insane as not to be responsible for the act, they should aquit him, but otherwise they must convict him.

The People *v.* McCann.

No exception was taken to the charge; but the counsel for the defendant insists that to instruct the jury that the defence of insanity must be established beyond a reasonable doubt, before the jury would be authorized to aquit the defendant, was erroneous, and, though no exception was taken, the judgment should be reversed and a new trial awarded. The third section of the act of 1855, entitled " An act to enlarge the jurisdiction of the Courts of General and Special Sessions of the Peace in and for the city and county of New-York" (*Laws of* 1855, 613) declares that every conviction for a capital offence, &c., shall be brought before the Supreme Court and Court of Appeals, from the Courts of Oyer and Terminer in this state, by a writ of error, with a stay of proceedings as a matter of right; and that the appellate court may order a new trial, if it shall be satisfied that the verdict against the prisoner was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below.

I am inclined to think this provision inoperative and void, so far as it relates to " the Courts of Oyer and Terminer of this state." The object of the act in which it is found is entirely local. It is to enlarge the jurisdiction of certain local courts in the city of New-York. The sixteenth section of the third article of the constitution declares that no local bill shall embrace more than one subject, and that shall be expressed in the title. I regard the provision in question as a palpable violation of this salutary restriction upon legislation. Who would have expected to find, in a bill to enlarge the powers of local courts in the city of New-York, a section making a radical and most important change in the powers of the Supreme Court and Court of Appeals? Instances had occurred in which important enactments had been smuggled through the legislature under cover of some bill with a modest and unpretending title; and to guard the legislature, as well as the public, against this kind of imposi-

tion, the framers of the constitution adopted the section to which I have referred. I cannot suppose that any legislature would have been willing to adopt the third section of the act in question, without qualification or restriction, if brought to its attention by a direct proposition to amend the law relating to writs of error and appeals in criminal cases. Such a provision, I am persuaded, could only have made its way through the various forms of legislation by clothing itself with the guise of a local measure, and thus eluding the scrutiny which its own importance would have attracted.

But I propose, now, to consider the grounds of objection to the charge, as though an exception had been taken in due form, that we may see whether justice, in fact, requires that a new trial should be granted; for I admit that, if it can be seen that the verdict is either contrary to law or against the weight of evidence, some remedy should be provided to save the defendant from the fatal consequences of the error.

The only complaint made by the defendant's counsel in respect to the charge is, that the judge instructed the jury that the defence of insanity must be proved beyond a reasonable doubt. In this I think there was no error. If it had been doubtful whether the defendant had committed the act with which he was charged, he would have been entitled to an acquittal upon the legal presumption of innocence which the law raises in his favor. By that presumption every man is held innocent until his guilt is established. But there is another legal presumption, equally operative as a rule of evidence, which is, that every man is presumed to be sane until his insanity is proved. So strong is the presumption of innocence that it can only be overcome by proof which establishes guilt "with a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it." This is what is called proof beyond a reasonable doubt. In like manner, the presumption of sanity must be overcome by proof of the same description. "What I mean

The People *v.* McCann.

is," says Chief Justice Hornblower, in *The State* v. *Spencer* (1 *Zabriskie*, 186), "that when the evidence of sanity on the one side, and of insanity on the other, leaves the scale in equal balance, or so nearly balanced that the jury have a reasonable doubt of his insanity, then a man is to be considered sane and responsible for what he does. But if the probability of his being insane at the time is, from the evidence in the case, very strong, and there is but a slight doubt of it, then the jury would have the right, and ought to say, that the evidence of insanity is clear. The proof of insanity at the time of committing the act ought to be as clear and satisfactory, in order to acquit him on the ground of insanity, as the proof of committing the act ought to be, in order to find the sane man guilty." (3 *Greenl. Ev.*, §§ 5, 29.)

The great object of punishment is the protection of society. The guilty are punished that the innocent may be secure. Such punishment is only due to those who are conscious of crime. Humanity revolts at the very thought of making a man who is unconscious of wrong the subject of criminal punishment. While, therefore, the defence of insanity should not be regarded with disfavor, yet, as it asks that the offender, though guilty of the act charged against him, may be excused from punishment, it is the duty of those who administer the law to see that such a defence is fully sustained by satisfactory proof before it is allowed to prevail. I cannot see that anything more was done in this case. The charge of the learned judge who presided at the trial was, in my judgment, unobjectionable. I think the judgment of the Oyer and Terminer should be affirmed.

GOULD, J. Having, in the case of *The People* v. *John Cummings*, considered the preliminary questions (as to the irregularity in organizing the jury, first, on account of the district attorney's not issuing a precept, &c.; secondly, by reason of the form and substance of the order of the Oyer and Terminer for summoning sixty additional jurors), it is unneces-

sary to repeat my views on those points; I therefore proceed to the points, as to rulings and charging, that are in this case only.

The prisoner's fourth point or exception is, like his fifth, upon a matter of evidence, referring chiefly, if not solely, to the motive the prisoner might have had for committing the homicide, for the purpose of showing that he did the act. This was actually the only ground on which it was offered, or objected to, or received, at the trial; and, in this point of view, the rulings, even if they were erroneous, would neither of them furnish any ground for ordering a new trial; since it appears in the bill of exceptions, and such was notoriously the fact, that before the defence commenced it was admitted, and it was so expressed by his counsel in opening his case, that the prisoner did the act. It is true that, on the argument here, such counsel claim that this testimony had a bearing on the question of insanity; but if it had, there are three sufficient answers to the exception: First. There was no such ground, for its exclusion, taken at the trial; Second. Had such ground been taken, or letting it be taken here, though not taken there, so far as the question of insanity is concerned, the proof is not as remote, in time, as the testimony the prisoner was allowed to give; Third. If it could have any bearing on that question (insanity), it could be only by furnishing a motive for a sane man to do the act; and that, whether he wished her to give him the money, and was angry that she did not, or thought that by killing her he would, as her administrator, get the money; and in that light it was eminently proper on that issue.

The first division of the sixth exception refers to a question put to Dr. Staats and excluded by the court. The mere reading of the question shows it entirely too vague to be allowed, having neither a necessary basis in the testimony, nor any basis given it in the question itself; a mere loose opinion, entirely inadmissible. The other division of that exception is, of necessity, to be read in connection with the

The People *v.* McCann.

permission to ask a question varying somewhat from the one excluded. That permission shows, necessarily, what was the exact fact, that at the time of putting this question there had not been the remotest intimation to court or jury, or the faintest idea, even in the minds of the prisoner's counsel, of an attempt to show any other kind of insanity than *delirium tremens.* This being so, the form of question suggested by the court was the only proper form, inasmuch as it required, not a general, vague, undefined opinion of some lack of reason, but a definite, professional opinion as to the prior continuance of the particular disease inquired for; and it put that opinion in a shape to be tried as a matter of professional skill and judgment. And, since we are to hear opinions, it should be borne in mind that they are to be only those of competent, skillful men; and then, so limited and precise, that other competent and skillful men can judge of, and testify as to, their accuracy. Any other rule is little short of making an opinion a verdict; since, if an opinion (such as was asked for) can be given, I see no qualification or test of its accuracy that can be applied by another witness or by the jury.

In regard to this point, and indeed to the whole case, it ought to be remarked that no bill of exceptions, in such a case, should ever be allowed, unless it contain the whole case with all the testimony. In the present case, points like the one just spoken of (and there are others in it in the same position) come before a court that has no means of knowing what the true case was, and who, therefore, must to some extent decide in the dark. Were this case before us as it was tried, it would present a very different aspect.

As to the form of the question to be put to medical witnesses, covered by the seventh exception, it involves this consideration: whether it is ever proper to allow testimony, which is at best a mere opinion, to be sought by an interrogatory so shaped as to leave the reply open in any degree to the construction, in the minds of the jury, that the medi-

cal witness, believes, or gives weight to, or in any manner sanctions as worthy of belief, the testimony which others have given as to facts. The form used, objected to and excluded, was, to a witness who had heard all the testimony: "What, in your opinion, do the facts stated by the witnesses on the trial, supposing them to be true, show as to the state of the prisoner's mind on the night of July 7th, 1856, the time his wife was killed?" In excluding it, it was stated that "it seemed impossible to ask this question without allowing the witness to answer, in fact, on his own impression of the truth of the evidence." And the prisoner was allowed to ask the witness' opinion on a hypothetical case, corresponding to the testimony, or by reading to him the testimony and asking him on the supposition that those facts were true; an allowance of which he very fully availed himself.

To show that this ruling was erroneous, we are cited to *The People* v. *Thurston*, tried in 1852 (2 *Park. Cr. R.*, 49, *and cases there cited*). In that case a new trial was granted by three of the four justices holding the general term; two founding their decision on the admission of improper evidence not touching the point here taken; and the third, Mr. Justice SHANKLAND, taking the ground that a witness who had not heard all the evidence could not give his opinion of the state of the prisoner's mind; and therefore, such testimony having been received in that case, he allowed a new trial, a position of which I certainly shall not dispute the soundness, especially when I find that the question, which he decided to have been improperly admitted, was in this form: "From what you have heard of the case, and what you have read of it, and what you know of it, what are your views of it?"

In the reasoning with which he accompanies his position he certainly states what would substantially sustain the position here taken by the prisoner's counsel. But any one who will read that case, and see how strangely the questions

were put, unobjected to, on all sides, will see that a very great temptation was laid in the way of any judge to go beyond the case in his comments. The questions put on the part of the prisoner had brought out this testimony: "the evidence presents to my mind a very extraordinary case; I have never seen one exactly like it. This case, I am constrained to think, taking all the various symptoms as stated by the witnesses to be true, and taking all the circumstances together, is one resembling, if it be not decidedly, such as is described in the books as instinctive or impulsive mania," &c., &c. And again: "Taking the evidence I have heard to be true, it appears to me that it shows the results of habits, &c., acting on a predisposition to insanity, and is, with the symptoms of general ill health, as detailed by the witnesses, very indicative, previous to the act, of the formative state of insanity." And again: "From what I saw of him in the jail, and from all the evidence given in the case bearing on the state of his mind at the time of the act, I think he was then insane." Observe, this witness does not qualify his opinion of the evidence by taking it to be true, and none of them treat it as questionable, by saying, "supposing it true." I must profess myself unable to see anything, worth naming, to be left to the jury, if this be legal evidence, especially when I find in the same case (*p.* 138) the opinion of the court, saying, "that where the medical witnesses are men of integrity and skill, and all agree that a given state of facts proves insanity, it is the solemn duty of the jury so to pronounce by their verdict." Thus taking it for granted that, though the "state of facts" is matter of proof, and the medical witnesses speak from the evidence, and by law the jury are to pass on all the evidence, there can be a "given state of facts" on that evidence, and saying that on that the medical witnesses give the verdict. I certainly am not prepared to go any such length, and it seems to me that nothing resembling public justice could long survive such doctrines.

In the *McNaughton case*, on the trial at *Nisi Prius*, the question was asked of a medical man who had been present in court and heard the evidence, whether, as matter of science, the facts stated by the witnesses, supposing them to be true, show a state of mind incapable of distinguishing between right and wrong. And it was allowed (10 *Clark & Fin.*, 200), and the prisoner was acquitted. So that the point under discussion was not decided in that case, except on the trial.

We will now see what was the opinion of the judges, as given to the House of Lords, on this, as one of the questions which that acquittal caused to be asked. (47 *Eng. Com. L R.*, 129, *note*.) The precise question put to the judges was "Can a medical man, conversant with the disease of insanity, who never saw the prisoner previously to the trial, but who was present during the whole trial and the examination of all the witnesses, be asked his opinion as to the state of the prisoner's mind at the time of the commission of the alleged crime; or, his opinion whether the prisoner was conscious, at the time of doing the act, that he was acting contrary to law; or, whether he was laboring under any, and what, delusion at the time?" In reply, Mr. Justice Maule says "In principle, it is open to this objection, that as the opinion of the witness is founded on those conclusions of fact which he forms from the evidence, and as it does not appear what those conclusions are, it may be that the evidence he gives is on such an assumption of facts as makes it irrelevant to the inquiry." But as it was allowed in the *McNaughton case*, on the trial, he considers that to be, for England, a precedent, but against principle.

The other judges joined in an opinion delivered by the Chief Justice, Tindal; and to this same question, treating its branches as distinct questions, they say: "We state that we think the medical man, under the circumstances supposed, cannot, in strictness, be asked his opinion in the terms above stated, because each of those questions involves

The People *v.* McCann.

the determination of the truth of the facts deposed to, which it is for the jury to decide; and the questions are not mere questions on a matter of science, in which case such evidence is admissible. But where the facts are admitted, or not disputed, and the question becomes substantially one of science only, it may be conveinent to allow the question to be put in that general form, though the same cannot be insisted on as a matter of right." I can only say that, to me, this seems not precisely an affirmative answer to the question And it should be specially noted, that the words used, "facts admitted, or not disputed," are decidedly stronger than any supposed form of question ("supposing them to be true"). And yet, even with those strong words, "the question cannot be insisted on." (*a*) But see (2 *Park. Cr. R.*,

(*a*) The full and exact meaning of this ruling, as to proving insanity, should be carefully noted. I think it contains what must ultimately be, and ought at once to be, fixed as the precise and only standard for such examinations. It says that in the very strongest possible case, a given case, the "facts admitted," when the question becomes, so far as the witness is concerned, one of mere professional skill and judgment, though it may be convenient, it is not a matter of right, to ask a general opinion as to insanity of a witness, who, not having personal knowledge of the accused, gets his facts from other witnesses: since, though, as those facts are admitted, he may, for the purposes of that case, be said to know them, he cannot know from anything but personal knowledge their combined effect, resulting in constituting the general apparent state of the man, which is the least that can authorize his giving, or qualify him to give a general opinion. When he founds such opinion on his own observation, you examine him in detail as to the particulars which he saw; and how, and why they, as symptoms of disease, constitute a basis for his opinion; and both by his own evidence and manner, as well as by calling other experts, as to his reasons in detail, you are able to apply a test to his opinion, general and particular: so that it is left to the jury to say of his, as they, and they only, are by law entitled to say of all testimony, whether his opinions have been formed or given dishonestly, or under a bias which disqualifies him, and presents him to them as not to be relied on; or whether, if both formed and given ever so fairly, he is so competent to judge that it is safe to follow his opinions.

And when others give evidence as to the facts (since the mercy of the law entitles the prisoner to every chance of making his proof, and so permits him even then to ask an opinion), you must so shape your questions as to keep as nearly as possible to the same sound principles. As the witness has observed no apparent general state, so he must give no general opinion. As he is told

135), the case of *The People* v. *Thurston*, where it is said the question was answered affirmatively ; and the dictum is based on that.

We are referred also to a case in the court of appeals, decided in 1855 (three years after the decision in the *Thurston case*), which is, like some of the prior cases, mainly to the point that a medical witness who has not heard all the testimony cannot give an opinion, as to sanity, founded on the part he has heard (2 *Kern.*, 358), and also to the point that it was improper to exclude hypothetical questions on a cross-examination.    There is, however, a remark, not a decision, in the opinion given in that case by Mr. Justice Hand (*p.* 362), that such a question as the one approved, as above, in 2 *Parker's Criminal Reports*, cannot be asked if objected to, he considering that it involves the witness' determining in his mind as to the truth of the evidence he has heard, while that should be left to the jury.    On this point the other judges expressed no opinion, as it was not strictly in the case.

I can only add, that every step I have taken, in a careful and minute investigation of all the authorities referred to, has but confirmed me in thinking that the decision of the Oyer was on this point quite as liberal a one as any sound legal principle will sanction.    It allowed the asking of an opinion on " a given state of facts," or a supposed one ; merely taking care so to separate the opinion from the testimony that the

single facts, or at most, in any one connection, but so many as any one witness relates, so he can only give his opinion whether such a fact, or such a connec-. tion of facts, if existing, is a symptom of disease of the mind, and of what type of disease ; and whether a usual symptom, a necessary one, or an infalli- ble one ; and to what stage of the disease it belongs.    You thus, and thus only, have an opinion so definite that you can apply to it the tests before spoken of.

And it is but to this latter and limited extent that, in strict legal principle, an opinion should be allowed, even as evidence, to go to the jury; and this only from the necessity of the case.    And always, and everywhere, any opinion, no matter how high the standing of the witness, or how honest and intelli- gent that opinion, can be but evidence ; or we must not pretend that we preserve the " trial by jury."

jury might not misunderstand the witness and suppose he was passing on the evidence, and, what is quite as important, that the witness might not mistake his position, and think himself authorized by virtue of his profession to pass on the whole case : for a thorough example of which, one need go no further than the extracts above given from the testimony in the *Thurston case.*

The remaining ground of exception (the prisoner's eighth point) is one that is of great interest, not merely in this particular case, but to the whole community, as it concerns the entire administration of justice in criminal cases. The frequency— a frequency that is so great as to have passed into a proverb, if "a by-word" be not the apter phrase — the great frequency of the interposition of this plea of insanity, whenever and wherever punishment hangs imminent over crime, makes absolutely necessary the adoption of some rule, that shall be both based on sound principles and of plain and easy application, while it shall to the prisoner and to the public secure neither more nor less than even handed justice. And while all human tribunals are bound to treat with reverence the dispensations of Providence, and to deal kindly with those who suffer under such dispensations, those tribunals have also in charge the general good of the whole community, and the personal safety of every member of it. Well, then, and carefully, does it behove us to inquire what is the nature of this defence of insanity, and by what kind and what degree of proof is it to be made out.

To keep the precise point in view : the charge, so far as relates to this exception, was : " the question of insanity is matter of positive defence, and it is a defence to be affirmatively proved. A failure to prove it is, like the failure to prove any other fact, the misfortune of the party attempting to make the proof. And in this case, as in all cases of fact, you are not to presume what has not been proved, under the distinctions and upon the principles already given you. The act being plainly committed, and that the

The People *v.* McCann.

prisoner did it being undoubted, and the defence being set up on his part that he was insane, the burden of proof is shifted. In the proof of the deed itself, if any reasonable doubt be left on your minds, the prisoner is to be acquitted. But as sanity is the natural state, there is no presumption of insanity. And the defence must be proved beyond a reasonable doubt. If, canvassing the whole evidence on the legal principles laid down in this charge, the prisoner has satisfied you, so far beyond a resonable doubt, that you find that he was at the time of the killing· so far really insane as not to be responsible for this particular act, you acquit, otherwise you convict."

This is claimed by the prisoner's counsel to contravene the rule established in trials for capital offences, that the prisoner is entitled to the benefit of a reasonable doubt of his guilt. And they thus paraphrase the rule : " if the jury had a reasonable doubt of sanity, they should acquit." This is not the rule, but a perversion of it, and the very language used begs the whole question ; it assumes that, on the part of the prosecution, sanity is to be proved : for it is too plain to admit of argument, that the rule, as to a doubt, never did and never can apply to what the prosecution is not bound to prove. And sanity is not a condition or state which the law compels the prosecution to prove. Being man, the accused is possessed, in legal presumption, of the powers and faculties of body and mind which are included in the name. And the only proof to be made on that point is that of the defence : and the defence asserts the fact that the prisoner differs from other men ; that the reason, which is a part of his human nature, is impaired or lost ; that he has ceased, by the positive operation of disease, to be the accountable agent described by the word man. Of necessity, and to the least informed understanding, the burden of proving this fact rests on him who asserts it. And suspicion is not proof ; a doubt is not proof ; raising a doubt is not proving a fact.

The People *v.* McCann.

These positions are but amplifications of the charge which is objected to. And the true tenor of that charge, its length and breadth, with or without the words " beyond a reasonable doubt," is fully covered by what, though not in the bill of exceptions, was actually a part of the charge as given to the jury : " The prisoner must satisfy you, by proof, that he was so far really insane as not to be responsible for this particular act." This surely covers the whole ground ; for, if on any point the mind be satisfied, it is utterly impossible that it can, on that point, have " a reasonable doubt." The two states of mind, doubt and satisfaction, cannot coexist on one point ; and, to apply to this the most unquestionable legal principle, a jury cannot find a fact as proved which is not proved to their satisfaction. By their oath, they are bound to find " a true verdict according to the evidence ;" and the fact of insanity is to be found, not suspected. Every proper charge, touching on insanity, to a jury, says : if you find that the prisoner was insane at the time, you acquit.

Thus far, as a matter of reasoning. Let us now see what, if any, is the authority. And for this we cannot, probably, do better than to resort to the opinions given to the House of Lords ; to which both parties before us, and all our own reported cases, are so ready to refer. And (47 *Eng. Com. L. R.*, 134, 135 ) I find all that is by them said on this point in the opinion (of all but Justice Maule, who says nothing on this point) given by the chief justice, which says : " The jury ought to be told, in all cases, that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction ; and that to establish a defence on the ground of insanity it must be clearly proved that at the time of the committing of the act the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing ; or, if he did know it, that he did not know he was doing what was wrong." I can see no point of the preceding

reasoning in support of the charge which is not completely covered by this opinion. " Proved to their satisfaction " is even more absolute in signification, without the words "beyond a reasonable doubt," than it would be with them. And, so far as I am informed, by the argument or otherwise, there is no authority varying from this but the 2d Alabama, (*p.* 43); and, from that, the quotation on the points for the prisoner is such as by no means to entitle it to prevail against the opinions above quoted. Mark the phrase: " Every member of the jury may have had a reasonable doubt of the prisoner's sanity." This is, perhaps, a degree above suspicion; but, if it be, it does not state the issue; it reverses it; since such a remark can apply to no point which the prosecution is not bound to prove.

In the very ingenious and strongly urged argument on behalf of the prisoner, two matters of defence were claimed to be analogous to that of insanity; in each of which two the prisoner is entitled to the " benefit of the doubt." But I think a strict examination of them will show that neither one really bears out the supposed analogy. The first of them is an *alibi.* This surely affords no parallel to the defence of insanity; as presence at the act, unlike sanity, is not presumed; and the proof of an *alibi*, though in itself affirmative, goes to what the law assumes to prove affirmatively; that is, that the prisoner, the physical being on trial, did the act; and such defence is, substantially, but in the nature of conflicting evidence. It is not a separate, or a separable, issue, but a fact going to the main issue already made, and is a mere contradiction of the people's affirmative of the issue; a negative of an averment necessary in the indictment, and one requiring to be made certain, by proof, to the satisfaction of the jury; or, which as above shown is the same thing, "beyond a reasonable doubt." And proof beyond a reasonable doubt cannot be predicated as necessary to both sides of one and the same issue. So, a reasonable

doubt on that issue, the people's affirmative issue, of course, acquits.

So of the other asserted analogy: "A homicide being proved, the defence proves circumstances to show that the killing was done in self-defence." The very statement shows it not analogous. The proof, though affirmative, *i. e.,* positive, not affirmative as meaning the affirmative side of an issue, is but of circumstances connected with the very deed, with the doing of the act charged as a crime, in the indictment, and to be proved by the people. Acting in self-defence is part and parcel of the transaction, of its very manner and substance; and, whether shown by the witnesses for the prosecution or by witnesses called by the accused, is but in the nature of conflicting evidence on the main issue; like a cross-examination, going to the body of the charge. It is as strictly but showing how the killing was done, as would be evidence, cross or direct, tending to show the killing to have been accidental.

Nor is it sound, either in law or in logic, to say that insanity is like any other negation of the offence; that it is but saying this man did not commit it, but a different being, a madman did it. This is already fully answered; this person did it; and if you assert that he is a different being from what he appears to be, claim him to be governed by delusion instead of reason, to be diseased, to be a madman, prove it.

And it is but a modification of the same position to say that, if the act were done by an insane man, an essential ingredient of crime was wanting, there being an absence of intent, which intent, either presumed or proved, is an affirmative part of the prosecution's case, and is to be shown "beyond a reasonable doubt." To this the answer is, the intent is not wanting even were the person a raving maniac. The maniac intended to do what he did, to kill the person killed; for there is a very different defence in accidental killing. But the maniac is not responsible for his intent or

its consummation, though cunningly planned, long premeditated and cruelly carried out. It is the responsibility that is wanting; and the excuse interposed to avoid this responsibility, to prevent the effect of an intent which, unexcused, has every essential of an intent legally criminal, is not any thing incident to, or part of, or connected with, the act, but exists in the man and not in his deed.

There is a further position on the prisoner's points which deserves at least a passing notice. This "bill of exceptions" shows that no exception was taken on behalf of the accused to any part of the charge, and that no request on his part to charge was denied. To any man of common sense, and much more to a lawyer, it would seem that the prisoner had, in the charge to which he consented, nothing to complain of, and no right now to except to that to which he then agreed. But an act of the legislature (*Laws of* 1855, 613, § 3) interferes with this plain common sense and this plain common law, and says that, "whether any exception shall have been taken or not," on the trial, the prisoner, if convicted, can take, on writ of error, as matter of right, any exception in or out of the case, and shall be at liberty to claim a new trial on any ground he can find, or suggest, or invent, before the court above. Under this act, if the prisoner does not like the looks of his jury or if he does, or if he thinks two chances better than one, or if he thinks it pleasant to play with the law, its officers and courts, or wishes to know the whole of the people's case to fit to it a defence made up, he has only to allow an improper question to a witness to pass unchallenged, or even by his own suggestion have an improper ruling made, and then bring his writ of error, and bring in his false defence, or try his luck once more; and this experiment he may repeat as often as the shape of his case will let him. I think the act must be admitted to be most remarkably adapted to the attainment of justice! Still, if such be the law of the land, it is to be enforced.

The People *v.* McCann.

Is it the law of the land? The constitution (*art.* 3, § 16) says no private or local bill shall embrace more than one subject, and that shall be expressed in the title. The title of the act in question is, "An act to enlarge the jurisdiction of the Courts of General and Special Sessions of the Peace in and for the city and county of New-York;" as plainly a local bill as one for opening a park in that city. But the third section of that act says, at the page above referred to, "every conviction, &c., shall be brought before the Supreme Court and Court of Appeals, from the Courts of Oyer and Terminer of this state, or from the said Court of General Sessions, &c., by a writ of error, with a stay of proceedings, as a matter of right." There is here put into a local bill a general provision totally different from the purposes of the act, embracing another subject, an entirely foreign jurisdiction, so far as the "city and county of New-York" are concerned and their Courts of Sessions, and one not expressed in the title or intimated there. It is just such a provision as would not attract attention, as would slip in unobserved by those who, looking to the title, considered it a merely local act, interesting to members from the city of New-York, and to them only. It is precisely within the mischief to remedy which the provision cited was put in the constitution, and its general nature cannot make the bill other than local or give effect to either a trick or a blunder which is a palpable fraud on both the law and the constitution. I consider it plainly unconstitutional as well as being in the teeth of all legal principles and all honest practices.

The discussion, which its existence has permitted in this case, I deem of much more consequence than any limited mischief it may do. And I am more than willing that the points taken should be followed out to a decision so authoritative as to settle the law of this state on questions so vitally important to the community. And I am gratified, that even by the means of such a section, full and free opportunity may be given to have any erroneous decisions I

may have given corrected by higher tribunals and abler judgments; although, until they have been so corrected, and to the end that the correction may be as broad and clear as the error, I deem it not only proper for me, but my duty, to give my reasons for my acts, that both may be fully considered, and may stand or fall together, if indeed, they belong together.

Judgment affirmed.

SUPREME COURT.   At Chambers, Erie, January, 1857.   Before *T. R. Strong*, Justice.